## No. 13,275.

TOWN OF CROWLEY VS. JAMES L. WEST.

### SYLLABUS.

1. A municipality which has voluntarily passed under the dominion of Act No. 136 of 1898, can not, under any general or implied authority, suppress or "locate," at pleasure, a lawful business, which is not a nuisance *per se,* where the act confers authority, in specific terms, merely to prescribe regulations whereby the establishment in which such business is conducted shall be kept clean and in good order.

2. A *fortiori* is it incompetent for such municipality to enforce an ordinance, whether adopted before or after its acceptance of the act of 1898, the effect of which is to permit four livery stables to be maintained in its business centre, whilst the fifth stable and all others which may be hereafter established, are to be regulated and confined to a designated locality, remote from such centre.

APPEAL from Mayor's Court, Town of Crowley. *Barry, J.*

*Philip J. Chappuis* and *Saunders & Gurley* for Plaintiff, Appellee.

*Hampden Story* and *Philip S. Pugh* for Defendant, Appellant.

The opinion of the court was delivered by

MONROE, J.   Defendant was fined for violating an ordinance of the town of Crowley which prohibited the establishment of livery stables, except within certain limits; and he has appealed to this court, on the ground that said ordinance is in contravention of statutory and constitutional law.

The ordinance in question was adopted in 1898, and, whilst it declares, "Section 1   *   *   *   That hereafter, it shall be unlawful to establish, maintain, locate, or operate a livery, feed, sale, and boarding stable within any portion of the corporation limits of the town of Crowley, except as hereinafter prescribed," and then proceeds to establish the limits, remote from the business centre of the town, in which such stables may be conducted, and to provide penalties for violation of the ordinance, the concluding section reads as follows, to-wit:

"Section 3.   That the provisions of this ordinance should not be " applied to livery, sale, boarding, and feed stables, already in exist- " ence and under operation.   Provided; that the effects of the ordin- " ance shall not be governed by this section, which is hereby declared " to be a distinct and independent part of the ordinance."

The admissions and the evidence show that, when the case was tried, there were five livery stables within the prohibited section of the town; one of them being conducted by the firm of which the defendant is a member, and another being a stable which had been sold before the adoption of the ordinance, by defendant's present partner, to the person who is now conducting it.   After this sale was made, and before the adoption of said ordinance, C. R. West, defendant's partner, purchased a lot, for which he paid one thousand dollars ($1000), also within the prohibited district, and ordered lumber and material for the erection thereon of a new stable, which, as we understand, has been since built at a cost of $1300; and said firm have, in the meanwhile, and after the adoption of said ordinance, carried on business in the stable, for the maintenance of which the arrest was made.

The ordinance, as it stands, will affect no other existing stable than that conducted by the defendant's firm, and said firm, if the ordinance is enforced, will be compelled to move within the limits designated, with the result that it will be unable to compete with the other stables, which are in the business portion of the town.

The points relied on by defendant, are:

That the corporate powers of the town of Crowley are derived from Act 136 of 1898, and that said act confers no authority for the adoption of the ordinance in question.

That said ordinance is invalid, because it was not "entered in a well bound book," as required by said act.

That said ordinance is unconstitutional and illegal, for the further reason that it is "discriminatory, unreasonable, arbitrary, and unequal in its operation and effect," and would "operate a hardship on defend-" ant, by compelling him to remove his stable from a limit, where " livery stables are now prohibited, to a locality designated and set " aside for that purpose, remote and distant from the central portion " of business, while others, his competitors, are permitted to carry on " a similar and like occupation, unmolested, and free from municipal " interference and objection."

That said ordinance abridges defendant's liberty with respect to the selection of a means of a livelihood, and denies him the enjoyment of his rights and privileges, and of his property, as guaranteed by the Constitution of the United States.

The town of Crowley was originally incorporated in 1894, agreeably to the provisions of Act No. 49 of 1882. The Act of 1882, however, purports merely to regulate the "manner" of incorporation, and contains no specific grants of power.

Whatever authority was exercised by the corporation thus established must, therefore, have been implied from the fact of its authorized existence as a municipal corporation. In 1899, said corporation, by the vote of its electors, and the proclamation of the Governor, as required by the act, accepted the offer made by the State, by means of Act No. 136 of 1898, and became a "town" under said act.

The Act of 1898 is of much broader scope than that of 1882, since the latter provided only for the "manner" of effecting incorporation, whilst the former provides not only for the creation of corporations where none previously existed, and for the conversion of corporations, already established under previously adopted statutes, into

corporations acknowledging it, said act, as the authority within which, alone, they exist; but it also specifies, in terms of great exactness, the powers which are to be exercised by the corporations so created, or converted, and it concludes with a clause which repeals all laws contrary to it or "on the same subject matter," except as otherwise provided in the act itself.

The acceptance of this act by the town of Crowley, as the Jordan through which it was born again, if it does not cut off inquiry into any previous existence, at least reduces that inquiry within very definite bounds. It may be conceded that existing ordinances, adopted during such previous existence, were not necessarily annulled by the regeneration of the town thus effected. But it must also be conceded that no such ordinance can be enforced, if found to conflict with the law within which the town now lives and moves and has its being, since the creature, in matters of this kind, is not more powerful than the creator.

The charter of 1894 assumed for the town the power, among other things, to regulate the "location," as well as the inspection and cleaning of "stables, cattle yards, slaughter houses, soap, glue, tallow, and leather factories, depositories for hides, and all such places of business, likely to be, or to become, detrimental to health," etc.; and it was under this charter that the ordinance in question which undertakes "to regulate the location of stables" was adopted. But, since the acceptance of the Act of 1898, there is no room for the assumption or exercise of any power not expressly or impliedly conferred by the act.

It is not pretended that the Act of 1898, in express terms, confers upon corporations established under it any authority to regulate the location of stables. The remaining question then is, can such authority be implied?

The act provides, in substance:

Section 13. That each city, town, or village, which is incorporated, " shall be governed by the provisions of this act and shall be a muni-" cipal corporation, with power;

First—To sue and be sued, etc.;

Second—To purchase and hold real estate, etc.;

Third—To make all contracts, etc.;

Fourth—To exercise such other or further powers as are herein conferred.

Section 14. That the powers herein granted shall be exercised by the Mayor and Board of Aldermen, etc.

Section 15. That the Mayor and Board of Aldermen shall have power to enact ordinances for the purposes hereinafter named, and such as are not repugnant to the laws of the State, and they shall have power,

"First—To levy and collect taxes for general purposes, etc.;

"Second—To levy and collect taxes to pay interest, etc.;

"Third—To make regulations to secure the general health of the " municipality; to prevent, to remove, and to abate, nuisances; to " regulate, or prohibit the construction of privy-vaults and cess pools " and to regulate or suppress those already constructed; to compel " and regulate the connection of all property with sewers and drains; " to suppress hog-pens, slaughter houses and stock yards and to locate " the same with the concurrent approval of the Board of Health, or to " regulate the same and to prescribe and enforce regulations for " cleaning and keeping the same in order, and the cleaning and keep- " ing in order of warehouses, stables, alleys, yards, private ways, out- " houses, and other places, where offensive matter is kept or allowed " to accumulate; and to compel and regulate the removal of garbage " and filth, beyond the corporate limits."

And there are twenty-nine more paragraphs in section 15, each conferring separate and specific powers on cities and towns and villages falling under the dominion of the act. In section 16, there are eleven distinct paragraphs, conferring specific powers on cities and towns, but not on villages; and in section 17, there are five paragraphs, which confer still further specific authority on cities and towns having more than two thousand inhabitants. But, nowhere else in the act are stables mentioned, save in the paragraph above quoted, where the corporations affected by said act are authorized to prescribe and enforce regulations for *cleaning them and keeping them* in order, in common with warehouses, alleys, private ways, out-houses, etc., whilst, in the same connection, and as part of the same sentence, the power is conferred to "suppress hog-pens, slaughter houses and stock yards, or to locate the same."

It will be observed, however, that the power to "suppress" and to "locate," thus conferred, is granted with the qualification, that it is to be exercised "with the concurrent approval of the Board of Health." The question, then, very naturally suggests itself; if the Legislature

had intended that the municipal corporations affected by the Act of
1898, should be authorized at pleasure to "suppress" or to "locate,"
warehouses and stables, what was to prevent the use of language
granting that authority; and why was language used which author-
izes other action, and falls short of authorizing such suppression or
location. And, again, is there any reason to suppose, taking the whole
paragraph quoted together, or taking the various provisions which
have been referred to together, that the law makers, in specifically
authorizing the suppression or location of hog-pens and slaughter
houses would require such action to be taken "with the concurrent
approval of the Board of Health," and yet, that they intended that
warehouses and stables should be suppressed, or located upon the out-
skirts of the town, without the concurrence of the Board of Health,
although the authority, as granted, with respect to them, extends only
to the prescribing and enforcing of regulations for keeping them
clean and in order?

The law applicable to the conditions as presented, is, as we think,
fully stated in the following language:

"  *  *  *   The extent of municipal authority over nuisances
" depends, of course, upon the powers conferred in this regard upon
" the municipality. They may be general or specific or both. The
" authority to preserve the health and safety of the inhabitants and
" their property, as well as the authority to prevent and abate nuis-
" ances, is a sufficient foundation for ordinances to suppress and pro-
hibit whatever is intrinsically and inevitably a nuisance. The
" authority to *declare* what is a nuisance is somewhat broader, but
" neither this nor the general authority mentioned in this last preced-
" ing sentence, will justify the declaring of acts, avocations, or struc-
" tures, not injurious to health or property, to be nuisances.  *  *  *
" It is not unusual to invest the municipal council with special
" authority with respect to particular avocations, trades, acts, omis-
" sions, and structures, with a view to conserve the public health and
" safety.

"The terms in which such authority is conferred measure its scope,
" but, in view of the end for which it is given, it is not subjected to a
" hostile, or even to a narrow construction," *Dillon on Mun. Corp.,*
" *Vol. 1, par. 379.*

"It is a doctrine, not to be tolerated in this country, that a muni-
" cipal corporation, without any general laws, either of the city or

" State, within which a given structure can be shown to be a nuisance,
" can, by mere declaration that it is one, subject it to removal by any
" person supposed to be aggrieved, or even by the city itself. This
" would place every house, every business, and all property in the
" city at the uncontrolled will of the temporary local authorities."

Yates vs. Milwaukee, 10 Wal., 497.

It has frequently been held that a livery stable is not a nuisance
*per se*. Shiras vs. Olinger, 50 Iowa, 571; Pickard vs. Collins, 23
Barb. (N. Y.), 444; Harrison vs. Brooks, 20 Ga., 537; Burditt vs.
Swenson, 17 Texas, 489; Wood on Nuisances, Secs. 528-9. And in the
case at bar, the Mayor, before whom it was tried, declined to permit
the defendant's counsel to ask a witness who was upon the stand, "In
what manner, and in what condition is the stable in controversy
kept?" on the ground that the question before him was, not how the
stable was kept, or whether it was a nuisance, but whether or not the
town had the right to enforce the ordinance, which prohibited the
keeping of the stable where it then was. There is nothing in the
record, therefore, to indicate that the defendant's stable was objec-
tionable in any way whatever, or to anybody, except (1) the preamble
to the ordinance under which he was prosecuted, which reads:
"Whereas, the indiscriminate establishment of livery, feed, boarding
" and sale stables, endangers the public health and the public safety,
" prejudices the comfort and well being of the community, depreci-
" ates the value of property, and greatly increases the danger of fire,
" therefore;" etc., and, (2) the following statement, embodied in the
Mayor's reasons for judgment, to-wit: "It is even more than an
" ordinary stable, being large, and being used for the penning and
" accommodation of a large number of animals for sale, and which
" make considerable litter, noise, and disturbance by their constant
" tramping upon the floor, thus affecting the health and comfort of the
" surrounding residents."

This declaration in the ordinance can not fasten upon a business
which is not in itself a nuisance, the pernicious, destructive, and
altogether alarming qualities which the language used attributes to
it, any more than these qualities can be fastened upon a "warehouse,"
or an "out-house," by the mere use of language. Nor can we accept
the statement, in the opinion of the Mayor, as being conclusive upon
the point to which he refers, since we find absolutely no testimony to
that effect in the record, not even that of the prosecuting witness, and

the Mayor, as has been stated, had ruled out all evidence upon the subject offered in behalf of the defendant.

We have, then, a case in which it appears that a person, engaged in a business which is conceded to be lawful, in which four other persons, or firms, are engaged, in the same town; which, so far as the record discloses, is conducted properly and inoffensively, is nevertheless, by the operation of a municipal ordinance, arrested and fined, because he has failed to establish his said business in a part of the town remote from the business centre, rather than at the place which he considers most advantageous; and it further appears that the other four persons, or firms, engaged in the same business, are not to be affected by the ordinance, but are to be permitted to conduct their business where they please, and that it naturally pleases them to remain in the central part of the town, from which the defendant is to be permanently excluded. The proposition that the defendant can be thus discriminated against, and that his four competitors in business can be thus secured the monopoly, in perpetuity, of the livery stable business in Crowley, can not be seriously entertained.

State vs. Mahner *et als.*, 43 Ann., 496; State vs. Dulaney, 43 Ann., 500; State vs. Garibaldi, 44 Ann., 814; State vs. Sarrad *et als*, 46 Ann.; 703; State vs. Kuntz, 47 Ann., 107; Tugman vs. City of Chicago, 78 Ill., 409; Dillon on Mun. Corp. (4th Ed.) par. 322.

It is said, however, that, by the terms of the ordinance itself, the section by which it was made inapplicable to those keepers of livery stables who were in business before its adoption, is to be regarded as in the nature of an independent enactment, which may be declared null without affecting the other sections, and that the ordinance may be held to apply to all livery stables in Crowley and to require the proprietors of such stables either to close them up, and to go out of business, or else to move them within the territory prescribed by the ordinance.

Pretermitting the consideration of the question whether such a method of dealing with the ordinance would be competent, and conceding, *arguendo,* that the section in question could be eliminated as suggested, we have, remaining, what may be called the main question, *i. e.,* assuming that the ordinance is to apply to all livery stable keepers in Crowley, and that, under its provisions, they will be compelled to move their establishments from the centre of the town to the dis-

trict designated therein—is the said ordinance a competent exercise of the authority vested in the corporation?

We find nothing in the record which would justify us in answering this question in the affirmative. Ordinances of municipal corporations, purporting to have been adopted in the exercise of implied, or general authority, must be "lawful," "reasonable," "impartial," "fair," "general," "consistent with public policy," and "not in contravention of common right." Dillon on Mun. Corporations (4th Ed.), pars. 319, 320, 321, 322, 323, 325, 326, 329. It is doubtful whether the ordinance in question meets any of these requirements. The business to be affected is a legitimate business, and there is not a syllable of testimony in the record before us going to show that it is conducted otherwise than in a proper manner, and inoffensively to others. The declarations of the preamble to the ordinance are met by the admitted fact that four, out of the five stables in Crowley which are said to endanger public health and safety, prejudice the comfort and well being of the community, depreciate the value of property, and increase the danger of fire, were to be left untouched, whilst the penalty for all this capacity for calamity breeding was to be visited on the defendant as the proprietor of the fifth stable, which is not shown to differ in any respect from the others. Under these circumstances, even if the act of 1898 had not granted the corporate authority, with respect to stables, in specific terms, the general, or implied authority to adopt ordinances in the interest of the general welfare of the community would not authorize such an oppressive discrimination between the defendant and other keepers of livery stables.

But the specific character of the grant of authority, to prescribe regulations for the "cleaning" and "keeping in order" of stables, warehouses, etc., taken in connection with the authority granted, in the same section, and in equally specific terms, to "suppress" or "locate" hog-pens, slaughter houses, etc., and taken in connection with the general tenor of the act, leaves no room for doubt that it was the intention of the law makers to distinguish between establishments of different kinds, and that it was not intended that any greater authority should be exercised with respect to stables and warehouses than that which is conferred in terms. And this limitation applies equally to ordinances in existence, when the town passed under the dominion of the Act of 1898, and to those subsequently adopted. Shreveport vs. Robinson, 51 Ann., 1314.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed; that the ordinance No. 88, under which defendant was convicted and sentenced, be decreed null, and of no effect, and that the defendant be discharged from further prosecution thereunder.