TRI-STATE GREYHOUND RACING, INC.

*v.*

TED W. JOHNSON, *President, et al.*

COUNTY COMMISSION OF CABELL COUNTY

W. VA., *a public corporation*

(No. 13774)

Decided October 29, 1976.

*Edward V. Lee, Robert H. Burford, John H. Hankins, Ern Reynolds* for relator.

*Robert K. Means* for Dr. Sheppe.

*Carney M. Layne, William C. Beatty and A. Michael Perry* for Johnson and Dunfee.

NEELY, JUSTICE:

This mandamus proceeding was brought for the purpose of interpreting the local option election provision of the West Virginia Racing Statute, *W. Va. Code*, 19-23-20 (1975). We granted a rule to show cause because the statute is highly ambiguous and required an interpretation before the November 1976 general election. We deny relief.

Relator, Tri-State Greyhound Racing, Inc., received tentative approval from the West Virginia Racing Commission on July 31, 1976 for the construction of a dog racetrack in Cabell County, West Virginia, and caused notice of the tentative approval to be published in the *Herald-Dispatch*, a Huntington newspaper of general circulation. On September 29, 1976, a counterpart petition under *W. Va. Code*, 19-23-20 (1975) was filed with the respondent County Commission of Cabell County requesting a local option election to be held at the next general election in Cabell County on November 2, 1976 on the question of the proposed construction and establishment of the dog racetrack in Cabell County.

On September 29, 1976, the Commission entered an order accepting the filing of the petition, declaring it to be timely filed, and declaring that it contained the signatures of 11,144 qualified voters residing in Cabell County. This number exceeded 15% of both the registered voters within Cabell County at the last general election and 15% of the number of persons who actually voted at the last general election. At the time the September 29 order was entered the Commission issued a call for a local option election to be held November 2,

1976, on the question of the construction and establishment of the dog racetrack. The Commission on October 1, 1976 amended this order in several minor ways which did not change the intent and purport of the original order.

At the time of the entry of these two orders a determination had not been made concerning the validity of the signatures on the counterpart petition. However, on October 12, 1976, the Clerk of the County Commission, at the Commission's request, reported at a regularly scheduled open meeting that he and his staff had determined, by a comparison of the counterpart petition with the voter registration records, that the petition contained the signatures of only 8,418 qualified voters and not 11,144. This report was accepted by the County Commission as being true, and by order entered October 15, 1976, the Commission declared the actual number of signatures of qualified voters to be 8,418 and further declared that there were 56,795 persons registered to vote in Cabell County at the time of the last general election. Fifteen percent of 56,795 is 8,519, or 101 more than the number of valid signatures actually submitted on the counterpart petition. Notwithstanding the apparent deficiency of 101 signatures, the respondents confirmed the September 29 and October 1 orders which declared the counterpart petition valid and called for the local option election.

I

The only substantial question presented to this Court is the proper interpretation of *W. Va. Code*, 19-23-20 (1975) which provides for a local option election after the filing of the counterpart petition. The relevant text of this section reads:

> "A petition for a local option election on the question of the proposed construction and establishment of a horse or dog racetrack must be signed by qualified voters residing within the county equal to at least fifteen percent of the

qualified voters within said county at the last general election. Said petition may be in any number of counterparts, but must be filed with the county commission prior to the expiration of the sixty-day period specified in the notice published by the racing commission in accordance with the provisions of section nineteen [§ 19-23-19] of this article."

Relator argues that the language "signed by qualified voters residing within the county equal to at least 15% of the qualified voters within said county at the last general election" should be interpreted as requiring the signatures of 15% of those persons registered to vote rather than 15% of those persons who actually did vote. Obviously at any given election registered voters far exceed the number of persons actually exercising the franchise. Accordingly, under relators's interpretation of the statute a far greater number of signatures would be required on the petition for a local option election than under the Commission's interpretation.

The ambiguity of this statute arises from the use of the words "qualified voters," because it is impossible to determine whether a person is "qualified" unless he has passed challenge. Anyone may register to vote, and had the Legislature used the term "registered voters," the class would have been definitely ascertainable. In the same manner, use of the word "voter" alone would have indicated all those persons who actually voted, again a definitely ascertainable classification. However, absent an inquiry into the circumstances of all persons registered to vote in Cabell County at the last general election, a determination of the "qualified voters" is impossible.

## II

While this Court could engage in substantial linguistic casuistry to arrive at a result which mandates the holding of the election, such discussion would be disingenuous at best. Dog racing, like any other exterprise involving gambling, has historically been subject to extensive

regulation by the State under the police power.[1] Although there are frequently reasons of public policy, the most compelling of which are usually economic, for permitting relaxation of laws prohibiting gambling, society's collective experience indicates that public policy is best served when a community is given ample opportunity to object to activities which potentially place in jeopardy the moral order of the community.

If we interpreted the language in question, *i.e.*, "qualified voters within said county at the last general election" to mean registered voters who were also qualified to vote, there would be an endless stream of litigation. In a county like Cabell, which has in excess of 50,000 registered voters, it may be reasonably assumed that a substantial number are not actually qualified to vote because they have moved, died, committed a felony, become mentally incompetent, or otherwise lost their franchise in that county. If, on the other hand, we interpret the words "qualified voters at the last general election" to mean those persons who actually voted, then there is no question whether they were qualified because their votes passed unchallenged. *Carroll County v. Smith*, 111 U.S. 556 (1884); *Simms v. County Court of Kanawha County*, 134 W. Va. 867, 61 S.E.2d 849 (1950).

We hold that the proper rule of construction is that the statute should be construed in such a way as to give effect to discerned legislative intent. This case necessarily turns on this Court's conception of what the West Virginia Legislature conceived as the public good.

---

[1] *State ex rel. Morris v. West Virginia Racing Commission*, 133 W. Va. 179, 55 S.E.2d 263 (1949), correctly stated the broad reach of the state's inherent police power:

"The police power is broad and sweeping, inherent in sovereignty and, except as restricted by constitutional authority, on natural right which, in effect, is unlimited."

This formulation has been quoted with approval in *Tweel v. West Virginia Racing Commission*, 138 W. Va. 531, 76 S.E.2d 874 (1953) *and harles Town Raceway, Inc. v. West Virginia Racing Commission*, 143 W. Va. 257, 101 S.E.2d 60 (1957). While all of these cases concerned horse racing, their logic applies with equal force to the matter of dog racing which is before us in this case.

While the modern libertarian philosophy of minimal government regulation of private morals was given effect by the 1975 Amendment to the racing statutes, it is clear that the intention of the Legislature was to permit racing only in those counties where a majority of the population felt that the economic or other advantages of such a venture outweighed its disadvantages. Consequently, it was the intention of the Legislature to permit local communities to express their preference in this regard at an election if any reasonable number of persons requested a public vote on proposed racetracks. Under our interpretation of the statute, 4,280 signatures were still required in order to place the question on the ballot as 28,533 persons actually voted at the last general election in Cabell County.

We find that the cases of *Riffle v. Clarksburg*, 152 W. Va. 317, 162 S.E.2d 181 (1968); *Bess v. Black*, 149 W. Va. 124, 139 S.E.2d 166 (1964); and, *Boyles v. County Court of Barbour County*, 116 W. Va. 689, 182 S.E. 868 (1935) cited by the relator are not on point because they did not involve statutes worded in the same fashion as the one before us.

For the foregoing reasons the writ of mandamus for which relator prays is denied.

*Writ denied.*