STATE, RESPONDENT, *v.* ROSE, APPELLANT.

(No. 2,760.)

(Submitted November 23, 1909. Decided November 29, 1909.)

[105 Pac. 82.]

*Criminal Law — Poolselling and Bookmaking — Constitutional Law—Evidence—Sufficiency—Admissibility.*

Poolselling and Bookmaking—Constitution—Special Privileges and Immunities.
    1.  *Held,* that Chapter 92, Laws of 1909, making it unlawful to record or register or to aid or abet in recording, reporting or registering any bet or wager upon races held without the state, and which, among other things, allows betting on speed contests held within racetrack or fairground inclosures in this state, for thirty days in first class counties and fourteen days in other counties, is not in contravention of the provision of the Constitution (Art. III, sec. 11) prohibiting the irrevocable granting of any special privileges, franchises or immunities.
Same—Constitution—Equal Protection of Laws—Who may not Invoke Provision.
    2.  One charged with having aided and abetted in recording, reporting and registering a bet on a horserace held *without* the state, contrary to the provisions of Chapter 92, Laws of 1909, may not call the constitutionality of the Act in question, on the ground that its provisions having to do with speed contests *within* the state, are a denial of the equal protection of the laws (Fourteenth Amendment, Federal Constitution), and local or special in their character (Constitution of Montana, Art. V, sec. 26). The effect of those parts of the Act dealing with contests held *within* the state was of no concern to defendant.
Same—Evidence—Sufficiency.
    3.  Evidence *held* sufficient to show that defendant, the manager of a telegraph company which had been organized shortly after the Act (Chapter 92, Laws 1909) prohibiting the recording or reporting of

horseraces held outside the state went into effect, was guilty of a violation of the statute.

Same—Evidence—Admissibility.

4.   Testimony showing the physical conditions in and about the building where defendant conducted the telegraph business of his company, both before and after its installation in the place where the violation of the anti-poolroom law (Chapter 92, Laws 1909) occurred, as well as testimony concerning any and all acts of the company and the defendant in the conduct of its business, was properly admitted.

*Appeal from District Court, Silver Bow County; Michael Donlan, Judge.*

HARRY ROSE was convicted of aiding and abetting in reporting, recording, and registering a bet on a horserace, in violation of Laws of 1909, Chapter 92, and appeals from the judgment and an order denying his motion for a new trial. Affirmed.

*Messrs. Mackel & Meyer* filed a brief in behalf of Appellant; *Mr. Alexander Mackel* argued the cause orally.

The Act (Chap. 92, Laws 1909) is unconstitutional, in that it creates a monopoly, and does so by special legislation. (Const., Art. III, sec. 11; Art. V, sec. 26. See *State* v. *Walsh*, 136 Mo. 400, 37 S. W. 1112, 35 L. R. A. 231.) It may be contended that the Walsh case has been reversed by the case of *State* v. *Thompson*, 160 Mo. 333, 83 Am. St. Rep. 468, 60 S. W. 1077, 54 L. R. A. 950, but we think there will be no difficulty in distinguishing it from the former. (See, also, *Bailey* v. *People*, 190 Ill. 28, 83 Am. St. Rep. 116, 60 N. E. 98, 54 L. R. A. 839; *State* v. *Bliler*, 138 Mo. 139, 39 S. W. 1117.)

The Act does not apply to all counties alike, and for that reason also violates that provision of the Constitution of the United States which provides that citizens are entitled to the equal protection of the law and all laws must be of uniform operation. (*Yick Wo* v. *State*, 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 221; *In re Sohncke*, 148 Cal. 262, 113 Am. St. Rep. 236, 2 L. R. A., n. s., 814.)

Rose was a common carrier of messages. He had no right to inquire whether or not the money and message sent were for the purpose of being bet on a horserace. The message was delivered to him as the agent for the Interstate Telegraph Company,

and it was his duty to receive and send it or lay the company liable to actual and penal damages. (*Western Union Tel. Co.* v. *Lillard,* 86 Ark. 208, 110 S. W. 1035, 17 L. R. A., n. s., 836.)

The sending of a telegram to a person outside of the state, which telegram transmits both money and the information and instructions instructing some person outside of the state to bet the money on a horserace, is not the commission of an offense under the anti-poolroom law, or, for that matter, under any law of this state. The transaction is not completed until the party to whom it is sent either accepts the bet, or places it with some other person who accepts the same.

"A wager, like other contracts, requires an offer and acceptance, and is therefore made where the offer is accepted." (14 Am. & Eng. Ency. of Law, 672; *Shaw* v. *Clark,* 49 Mich. 384, 43 Am. Rep. 474, 13 N. W. 786; *Harris* v. *White,* 81 N. Y. 532; *Jacobus* v. *Hazlett,* 78 Ill. App. 239; *People* v. *Fallon,* 4 App. Div. 82, 39 N. Y. Supp. 865; *Edson* v. *Town of Pawlet,* 22 Vt. 291; *Martin* v. *State,* 71 Miss. 87, 14 South. 530; *Long* v. *State,* 22 Tex. App. 194, 58 Am. Rep. 633, 2 S. W. 541; *Postal Tel. Cable Co.* v. *Lathrop,* 33 Ill. App. 400; *Sondheim* v. *Gilbert,* 117 Ind. 71, 10 Am. St. Rep. 23, 18 N. E. 687, 5 L. R. A. 432.) "Where an offer to bet is telegraphed by a person in this state to another in a foreign state, who accepts by telegraph, the betting is done, not within the state, but within the foreign state, because the offer, being accepted there, takes effect there." (*Lescallett* v. *Commonwealth,* 89 Va. 878, 17 S. E. 546.)

One who aids or abets another cannot be guilty of a crime unless the aiding or abetting results in the commission of a crime on the part of that other. No doubt a law could be passed forbidding the transmission of money by telegraph or other means from this state to other states to be wagered on horseraces. Virginia and Connecticut have such a law, but the Act under discussion falls far short of being such a law. When doubts arise concerning the interpretation of such statutes as this, they should weigh only in favor of the accused. (14 Am. & Eng. Ency. of Law, 667.)

There was a brief in behalf of Respondent, by *Mr. Albert J. Galen*, Attorney General, and *Mr. E. M. Hall*, Assistant Attorney General, and oral argument by *Mr. Hall*.

The reasoning employed, and the many authorities cited in *State* v. *Thompson*, 160 Mo. 333, 83 Am. St. Rep. 468, 60 S. W. 1077, 54 L. R. A. 950, are conclusive upon the question of the constitutionality of the Act in question. (See, also, *Debardelaben* v. *State*, 99 Tenn. 649, 42 S. W. 684; *State* v. *Dycer*, 85 Md. 246, 36 Atl. 763; *Ex parte Tuttle*, 91 Cal. 589, 27 Pac. 933; *Louisville* v. *Wehmhoff*, 25 Ky. Law Rep. 995, 1924, 76 S. W. 876, 79 S. W. 201; *State* v. *Stripling*, 113 Ala. 120, 21 South. 409, 36 L. R. A. 81; *Odell* v. *City of Atlanta*, 97 Ga. 670, 25 S. E. 173.)

Under the provisions of the law it is immaterial where the bet or wager is actually made. The subterfuge resorted to to evade its plain provisions were resorted to in several other states, but without success. (*State* v. *Townsend*, 50 Mo. App. 690; *Ransome* v. *State*, 91 Tenn. 716, 20 S. W. 310; *People* v. *Weithoff*, 93 Mich. 631, 32 Am. St. Rep. 532, 53 N. W. 784.) The following courts have held under facts almost identical with these in the case at bar, that the bet was where the money was received for transmittal: *Ransome* v. *State*, 91 Tenn. 716, 20 S. W. 310; *People* v. *Weithoff*, 93 Mich. 631, 32 Am. St. Rep. 532, 53 N. W. 784; *State* v. *Townsend*, 50 Mo. App. 690. The case of *Lescallett* v. *Commonwealth*, cited by appellant, is not in point. The law construed in that case made it unlawful to keep any house "for the purpose of making, writing or selling therein any book or pool or mutual, or of otherwise betting or gambling or of permitting gambling or betting therein." The court held under this statute that the state must prove that the house was used for "betting therein," and that a bet sent by telegram was not a bet "therein."

MR. JUSTICE SMITH delivered the opinion of the court.

The state of Montana, in the district court of Silver Bow county, accused the above-named defendant, together with

Harry Sweet and Ed. Sylvester, with having committed a misdemeanor, in that he "did aid and abet in reporting, recording, and registering a bet or wager upon the result of a contest of speed and endurance of animals, to wit, horses, held without the state of Montana, by transmitting, communicating, and transferring money and information for the purpose of having a bet or wager upon the result of said contest of speed * * * reported, recorded, and registered." Defendants Rose and Sylvester entered pleas of not guilty. Separate trials were had. The defendant Rose was convicted by a jury, and from a judgment of conviction and an order refusing a new trial he appeals.

The statute relied upon by the state reads as follows:

"Sec. 1. It shall be unlawful to make or report or record or register any bet or wager upon the result of any contest of speed or skill or endurance of animal or beast, whether such contest is held within or without the state of Montana, unless said contest is held within an inclosed racetrack or fair grounds and said bet or wager is made and all acts done in making, registering, reporting and recording said bet or wager are done within the inclosure of the racetrack or fair grounds where such contest is held, and upon the same day such contest is held.

"Sec. 2. Whenever, during thirty days, whether consecutive or not, in any calendar year in any county of the first class and whenever, during fourteen days, whether consecutive or not, in any calendar year, in any county not a county of the first class, there have been bets or wagers made, or reported or recorded or registered upon the result of any contest of speed or skill or endurance of animal or beast upon any inclosed racetrack or fair grounds, it shall thereafter be unlawful during such calendar year to make, or report or record or register any wager or bet upon the result of any contest of speed or skill or endurance of animal or beast held within such inclosure.

"Sec. 3. Any person who aids or abets in the commission of any of the acts made unlawful in sections 1 and 2 hereof, either by transmitting or communicating or transferring money or other thing of value, or information for the purpose of having

bets or wagers made or reported or recorded or registered, shall be deemed a principal in the commission of such offense." (Laws 1909, Chap. 92, p. 122.)

The first contention of the appellant is that the foregoing law is unconstitutional. His argument is that, because racetrack or fair-grounds betting is allowed for thirty days in counties of the first class, and for only fourteen days in other counties, therefore the Act creates a monopoly and is also class legislation. He invokes Article III, section 11, and Article V, section 26, of the state Constitution, in aid of his contention. Those constitutional provisions read as follows: Section 11 [Article III] : "No *ex post facto* law nor law impairing the obligation of contracts or making any irrevocable grant of special privileges, franchises or immunities shall be passed by the legislative assembly." Section 26 [Article V] (in part) : "The legislative assembly shall not pass local or special laws in any of the following enumerated cases, that is to say * * * granting to any corporation, association or individual * * * any special or exclusive privilege, immunity or franchise whatever," etc. He also relies upon the provisions of section 1, Article XIV, of the amendments to the Constitution of the United States, relating to the equal protection of the laws.

There is nothing in the record to disclose that any monopoly is created. As a matter of fact, an evil may be imposed upon the people of Silver Bow county (a county of the first class) rather than a benefit. No "special privileges, franchises or immunities" are irrevocably granted. (See *State* v. *Walsh,* 136 Mo. 400, 37 S. W. 1112, 35 L. R. A. 231.) And defendant cannot successfully invoke section 26 of Article V of the Constitution, or those constitutional provisions, federal or state, relating to the equal protection of the laws, for this reason: The statute upon which this prosecution is based absolutely prohibits making, reporting, recording, or registering any bet or wager on any contest of speed held without the state. By section 1 of the Act it is made unlawful to make, report, record, or register a wager, such as is therein mentioned, unless the contest is held

within an inclosed racetrack or fair grounds; and it is further provided that all acts done in making, registering, reporting, and recording such bet must be done within the inclosure where such contest is held. As it would be a physical impossibility for a person in Montana to make a wager on a race held without the state, in the same inclosure where the contest was held, it follows that the Act prohibits betting, or recording, reporting, or registering a bet or wager, on any contest held outside of the state. It is unlawful to make, report, record, or register any wager on a contest of speed without the state, even though such acts are committed within the inclosure of a racetrack or fair grounds during the period when wagering upon the contests held within such inclosure are lawful. The defendant is therefore not concerned with the effect of those parts of the Act which deal with contests held within the state. (*Uihlein* v. *Caplice Com. Co.*, 39 Mont. 327, 102 Pac. 564.) The act with which he is charged is prohibited to all the people, at all times, and at all places.

The main contention of the defendant is that there is no testimony in the case to warrant the finding that he has been guilty of aiding or abetting in the commission of any of the acts prohibited by the statute or mentioned in the information. In this connection he argues: That, before he can be legally convicted, it must be affirmatively shown that a wager was actually made; that the testimony shows that, if any wager was made, the transaction was completed and took effect, not in this state, but in Idaho; that the corporation hereafter mentioned, to-wit, the Interstate Telegraph Company, was engaged in the legitimate business of transmitting commercial messages and money by telegraph; that he, as its agent, was also engaged legitimately; that the court erred in admitting the testimony of certain witnesses as to what occurred in and about the premises occupied by the defendant, and in adjoining rooms at times prior to the date of the alleged commission of the offense charged. We may discuss, and dispose of, these contentions as a whole.

The record discloses, satisfactorily to our minds, that the fundamental question presented to the jury was whether the

defendant has devised a method of avoiding the operation of the so-called "poolroom law" passed by the last legislative assembly; whether he has succeeded in discovering a way to carry on the business of selling pools on horseraces occurring outside of the state, with which business he was connected prior to the passage of the Act, in such a manner as that he cannot be punished therefor. That was the question confessedly presented to the jury by the defendant himself, and is the one for this court to settle. The attempt and the complicated devices employed evidence an ingenuity which might have been devoted to a better cause. Whatever differences of opinion may exist as to the necessity for, or expediency of, such laws, no right-minded man will seek to controvert the proposition that, having been enacted, they should be obeyed and enforced.

There is substantial testimony to prove these facts: On or about April 8, 1909, the county attorney, sheriff, and several deputy sheriffs of the county of Silver Bow went to the office of the Interstate Telegraph Company, a Utah corporation, in Butte. They found the defendant Rose behind a railing, in a space partitioned off similar to a bank, with a cashier's or teller's sign over one of the windows. Rose undertook to explain to the officers the workings of the concern, seemed anxious to do so. A man named Kleinschmidt came in and handed him a message and a $20 gold piece. The message read: "Butte, Mont. Apr. 8, 1909. Interstate Telegraph Company. Pay to Wm. Wright at (address) C D'Alene (City) ——— Glorio first at track odds 20.00. [Signature] Schmidt." On the face and back of the telegraph blank were printed conditions and stipulations similar to those found on Western Union and other telegraph company blanks.

Rose told the officers that if they would wait a few minutes they would see the complete transaction. Quoting from the testimony of the county attorney: "When they would complete the transaction. This message was handed to Rose and given to the telegraph operator, who ticked his instrument and apparently sent a message. Later on, about ten or fifteen minutes,

an answer came and was delivered by the operator to Klein-schmidt. This is the answer: 'Coeur d'Alene, April 8, Schmidt, Butte. Your on. Wm. Wright.' Rose said that if anybody came in and wanted to make a bet on a horserace they would transmit the message, and he explained this as the method of doing it: They would give him a money order of this kind. The order would be written out by the sender. For instance, Glorio was a horse running at one of the California tracks that day. 'Glorio first at track odds 20.00.' I inferred that Schmidt wanted to bet $20 on Glorio to win at the track odds. Refer-ring to that message, sometimes Rose used the word 'bet' and other times he checked himself and used the words 'business message.' I think there was a slip returned to Mr. Klein-schmidt at the time he passed this message in. There is a di-rect connection between the M. & M. saloon, known formerly as M. & M. poolroom, to the Interstate Telegraph Company's office, by a stairway. There is a door leading right up the stairway, directly to the door of the Interstate Telegraph Company's of-fice. People are going in and out there, using that stairway from the saloon to the Interstate Telegraph Company's office, and we used it ourselves. Downstairs, in the saloon proper, on the ground floor, we found a large blackboard upon which was marked the names of horses in different races at California. I think one sign read 'New Orleans,' I am not sure, 'Oakland,' and 'Los Angeles,' the different races, six rows, I think; and opposite the name of the horse there was written the odds that you would have to bet on the first horse, and the second horse, and so on. I am not sure whether the jockies were there on the day I was there, or not; but I have seen the distances seven-eighths, or five-eighths, or a mile race, and when the telegraph opera-tor read the news of the race he recorded that with a circle around the horse that won. Second he would mark '2' through the name of the horse, and the horse that came third a '3.' That meant that the horse circled was the winner of the race, that No. 2 was second, and No. 3 third. After that there would probably be five or six minutes delay, and the operator would confirm the race, and the bets would be paid. The operator would sit down there

in the downstairs portion receiving the information from the instrument, and the races were called when they reached the post. The conditions that I found downstairs in the M. & M. saloon, as to the operation of the poolroom, had not changed a bit, in my opinion, from the time before the law was passed, with the exception that fewer men were employed. They had a marker and an operator when the law was not in force and when it was in force; but I didn't see the men at the windows—that is, taking bets openly. There was no cashier in sight, and no ticket marker. The law went into effect March 5, 1909. I got it from Rose himself that the wire, over which the information gotten from the ticker came, came from the Interstate Telegraph Company and the Western Union. The Western Union leased the wire to the telegraph company, and they in turn connect with the M. & M. saloon. The M. & M. has a direct connection with the wire. If Glorio won that day, I don't know whether Rose or the Interstate Telegraph Company was to pay anything to Kleinschmidt. I have no proof. I don't know whether this Wright or Rose was to pay the money. I saw no sheet writer in the poolroom. The duty of a sheet writer is to record the bets. In my opinion this telegram takes the place of a sheet writer. In all poolrooms if you want to bet on a horse they will give you a ticket which says what money you are entitled to in the event the horse wins. Now this would answer the same purpose, in my opinion. I would not, of course, expect to find a cashier sitting out in front where the police were listening, unless he expected to be placed under arrest. About this entrance leading from the M. & M. saloon to the upper portion—that upper portion was used as a faro-room. This entrance was put in for the purpose of allowing the people to go from the saloon directly to the gambling house. There was nothing in the receipts given which showed that a man is betting on a horse. It would be a dead give-away if they did. Taking the receipt, together with the telegram, you have all the purposes of a sheet, and also of a ticket—a clear transaction on its face. I know, generally, the system of operating poolrooms.''

Thomas Mulcahy, a deputy sheriff, testified: ''When Rose called the attention of the officers to this transaction, he said he

wanted them to see how he ran his business, and see whether he was right or wrong in regards to a poolroom."

William Floto testified: That about April 10 "I saw a telegram filled out by a gentleman. The transaction was just completed as I came upstairs. He spoke to Rose, and the message was handed to him with a silver dollar. I don't know what the message was or who signed it. At the time this little part attached to each blank was filled out by Rose and handed to this gentleman, who says, 'How will I know if I win?' and Rose says, 'Bring that in, and if you win there will be a telegram in the box for you.' I said to Rose, 'You will have a hard time educating the suckers to this game,' and he says: 'We don't want to educate the suckers. We can do sufficient business without them if we are permitted to go on.'"

Rose testified: "I am manager of the Interstate Telegraph Company. It was incorporated March 23, 1909. Neither I nor the Interstate Telegraph Company has anything to do with the posting information on the blackboard downstairs. I know Kleinschmidt. I told O'Rourke, the sheriff, I would demonstrate to him how a message could be sent on a horserace, or transmit money to another state. I had Kleinschmidt write out the telegram to William Wright, Coeur d'Alene. Then I took the telegram to my operator, and said, 'Send this to Coeur d'Alene,' and I got an answer to it for Kleinschmidt and asked Mr. O'Rourke to be a witness to the transaction. I took him through the different courses and steps that a money order would have to go through. The message was transmitted to Coeur d'Alene and Coeur d'Alene charged our office with the transmission of the message and $20 cash, which we had received here. I gave Kleinschmidt a receipt showing that he had sent a telegram, also showing that he had sent $20. Our man in Idaho pays Wright the $20, and did in this case. Supposing that this horse Glorio had won, we would merely gain the transmission of the money on the message. It would make no difference to us whether the horse won or lost. We pay nothing. We place nothing against it as a wager. We would gain a little bit more if the horse won, because the man at the other end

would require another message. It does not make a particle of difference to us whether a horse wins or loses. A feature of our business is the telegraphic money order and message combined. We have incorporated for the purpose of saving money to the people. You can send a message with the money order. The Western Union would charge for two messages. That is the only difference between our system and the Western Union. There was nothing in the receipt given to Kleinschmidt to indicate that he had bet on a horse. The only way we would know if the horse 'Glorio' had won would be through advices from our office at that point. We would receive a message stating to pay a certain amount of money to a certain party, but for what purposes we know not. It is not necessary to return the money through our office. Mr. Wright could go to work and return it by way of the Western Union or the Postal, or by letter, or by express money order. We have a form of notice similar to that used by the Western Union or the Postal notifying customers that there is a telegraphic money transfer at our place. Our office would get the money by having it sent from some other office on our line. Practically for three years immediately prior to April, 1909, I was working in poolrooms and in connection with racetracks, and as a matter of fact I was thrown out of employment when the anti-poolroom bill went into effect. The M. & M. instrument was furnished from our wire. We ran a loop from our main office to the downstairs. I actually sent this $20 to Idaho. I sent it by draft when settling up with the office. I had reason to believe that 'Glorio' ran that day. I transmitted this message, and I am prepared to transmit all messages, commercial or otherwise."

The learning and industry of counsel for the defendant have resulted in making a most elaborate and exhaustive brief, in which the legal propositions relied on by them are ably set forth and argued; but our examination of the record leads to the conclusion that the facts of the case do not warrant the application of the principles contended for. The defendant cannot successfully claim that no wager was in fact made, for the reason that he himself undertook to show how a wager

could be made.  He called upon the officers to witness how the thing was done.  He said to the sheriff: "I will demonstrate to you how a message can be sent on a horserace."  He had Kleinschmidt write out the telegram addressed to Wright.  The telegram itself shows that a wager was to be made.  It is of no consequence where the transaction was completed, if it was reported, recorded, or registered in this state.  The defendant is not charged with making the wager, but with aiding and abetting the acts of recording, reporting, and registering it, by transmitting, communicating, and transferring money and information for the purpose of having it made.  These latter acts must, of course, have been done within the state.  We should have no hesitancy in determining that this wager on the horse "Glorio" was reported, recorded and registered in the office of the defendant in Butte, even in the absence of the testimony of the county attorney to the effect that the telegram, with the receipt therefor, answered all the purposes of a record sheet and a pool ticket.  The defendant's own testimony shows that he transmitted and communicated information and transferred money for the purpose of having the wager made.  And, again, he testified that his company had no interest in the result of the race, and it may be true that neither the defendant nor the company paid directly in case a wager was won; but we think the jury would have been justified in finding from the testimony of Floto that there was an arrangement of some sort, to which the telegraph company was a party, by which, in case of a successful wager by a patron of the concern, the money would be paid on the premises.  The only purpose of such a conclusion, however, would be to show that the wager was actually made in Butte, and, as we have heretofore said, that matter is immaterial in this case.

The testimony of witnesses as to the physical conditions in and about the building where the telegraph company conducted its business, both before and after its installation there, was competent; as was also testimony concerning any and all acts of the telegraph company and the defendant in the conduct of their business.  This testimony served to illustrate the man-

ner in which the business was carried on and the nature thereof, and enabled the jury to determine whether or not the business consisted in making, reporting, recording, or registering wagers on horseraces conducted outside of the state; in other words, in conducting a poolroom. It also served as a proper basis for the testimony of the county attorney, who was familiar with such matters, to the effect that the new methods devised were substantially the same in their practical operation, and served the same purposes, as those theretofore employed, which the law was designed to punish, if continued.

All other assignments of error relate, incidentally, to those already considered. We find no reversible error in the record.

The judgment and order are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.

Rehearing denied January 7, 1910.