# CHARLESTON.

GROVES *et al v.* COUNTY COURT OF GRANT COUNTY.

Submitted June 24, 1896—Decided Dec. 5, 1896.

1. APPEARANCE OF PARTIES.

Appearance is the first act of the defendant in court, and is triable by the record, which is a verity. It is the formal act by which a person against whom a suit has been commenced "comes" and submits himself to the jurisdiction of the court in person or by attorney.

2. APPEARANCE OF DEFENDANT—PLEADING.

And it may be for no other purpose than to put upon the record the fact that, as defendant, he is present in court, and because there can be no pleading till appearance is effected.

3. APPEARANCE OF DEFENDANT—WAIVER.

If the defendant makes his appearance for that special purpose, he may take advantage of the defective execution or of the non-execution of the notice or process. But, if his appearance is general, or for any other purpose, he thereby waives all objection to the defective execution or the non-execution of the notice or process.

4. JUDICIAL NOTICE.

This Court takes judicial notice of all such acts and resolutions of the legislature, though local and private, as appear to have been relied on in the court below. See section 1, of chapter 130, of the Code.

5. CONSTITUTIONAL LAW—GENERAL ACTS—SPECIAL ACTS.

To take from the past a specified period of time, and a single transaction as having occurred within that period, but by circumlocution described as a class, and then take as the characteristic of the class the peculiarity of having occurred within such past period of time, to mark and distinguish the class thus ap-

parently created and set apart as the subject-matter to be dealt with, such law, though general in appearance, is special in effect.

6. CONSTITUTIONAL LAW—SPECIAL ACTS—COUNTY SEATS.

So much of chapter 31 of the Acts of 1895 as provides for the relocation of county seats by a majority vote in cases where the county seat of any county in this state has, since the 1st day of January, 1872, been relocated by a special act of the legislature, is a special law, and as such is prohibited by section 39 of article VI of the Constitution, and is therefore unconstitutional and void.

C. W. BAILEY and F. M. REYNOLDS for plaintiff in error.

I.—*The several subdivisions of the state may be classified and laws enacted which will affect differently the several classes and thus be in a sense local; and yet such laws are general within the meaning of the Constitution.*—11 Vroom, 123 (40 N. J. L.); 29 Am. Rep. 210; 42 N. J. L. 435; 39 Iowa, 112; 84 Cal. 226; 77 Pa. St. 338; 39 Fed. Rep. 651; 73 Cal. 310; 97 Mo. 543; 62 Ind. 159; Suth. St. Con. § 127; 75 N. Y. 346; 92 N. Y. 4; 107 N. Y. 593; 1 Am. St. Rep. 904 (note).

II.—*The vote of the people moves the county seat.*—38 W. Va. 74; 39 W. Va. 634.

III.—*The presumption of constitutionality is favorable to the act.*—39 W. Va. 144; 38 W. Va. 338; 36 W. Va. 803 (syllabus 2).

IV.—*The act is general.*—Chap. 31, Acts of Legislature, 1895.

V.—*The act is no more special now than it was when Minear v. County Court was decided.*—See last six lines of page 52, Acts of 1895; 39 W. Va. 627.

VI.—*The return of service was void.*—Code, c. 39, s. 5, c. 121, s. 1, c. 50, s. 32, c. 41, s. 6; 12 W. Va. 756; 4 W. Va. 493; *Id.* 533; 130 U. S. 301.

VII.—*Waiver by appearance must be for some substantive purpose and the record must be clear as to the same.*—20 N. Y. Sup. Ct. 157; 4 H. & M. 293, 302; 37 Ver. 94; 86 Am. Dec. 690; 39 W. Va. 637.

COUCH, FLOURNOY & PRICE for defendants in error, cited Code, c. 39, s. 15; 30 W. Va. 13; 15 W. Va. 609; 35 W. Va. 438; 3 W. Va. 386; 16 W. Va. 109; Const. Art. V. s. 39;

136 U. S. 313; 138 U. S. 78; 141 U. S. 62; 23 Am. & Eng. Enc. Law, 148 (and notes); 2 N. Dak. 270; 39 W. Va. 635; 29 W. Va. 63-87; 37 Minn. 264; 42 N. J. Law, 435, 440; Const. N. J. Art. IV, § 7; 42 N. J. Law, 51; Const. Mo. Art. IV, § 53; 75 Mo. 340; Const. Pa. (1873) Art. V, § 7; 77 Pa. St. 338; 85 Pa. 401; 122 Pa. St. 266; 40 N. J. Law, 71, 80; 88 Pa. St. 258; 106 Pa. St. 377; 44 N. J. Law, 363; 47 Ohio St. 90; 21 Am. St. Rep. 780-89; 31 Ohio St. 692; 84 Ill. 590; 32 Kan. 431; 43 Ohio St. 112; 19 Nev. 43; 83 Cal. 393, 394; 69 Ind. 184; 3 Am. & Eng. Enc. Law, 695 *etc.;* Suth. St. Con. 160; 2 N. Dak. 270; 14 L. R. A. 725; Cooley, Con. Law (6th Ed.) 209 *etc;* Const. Art. VIII, s. 12; 29 W. Va. 63; 30 W. Va. 58; 27 W. Va. 244; 1 Coke, Ins. 260; 1 Chit. Pl. 512; Vanfleet Coll. Attack, § 526; 80 Ill. 307-14; 15 Ill. 159; 20 Am. & Eng. Enc. Law, 502; 17 Am. & Eng. Enc. Law, 471; Rob. Forms, pp. 13, 14, 96, 101, 106, 107, 115, *etc.;* 3 Porter (Ala.) 267; 42 Ala. 491-92; 5 Porter (Ala.) 166; 8 Porter (Ala.) 442; 35 W. Va. 443; 15 W. Va. 619, 2d pt. syl.; 1 Am. & Eng. Enc. Law, 183; 1 Moss. (Iowa) 403; 25 Ill. 107; 33 Ill. 518; 8 Neb. 109; 66 Ala. 223; Imp. Pr. C. P. 175; 1 Tidd. Pr. (3d Ed.) 238; 1 Sel. Pr. 91; Steph. Pl. p. 81; 7 Cowen, 366; 17 Am. Dec. 525 (note); 2 Tuck. Com. 230 (margin 236); 3 Peters, 459; 17 Wall, 545; Bart. Law Pr. 314-315; Fed. Jud. Act, 1789, § 11; Peters, C. C. Rep. 489; 3 Mass. C. C. Rep. 158; 4 Minor's Inst. 296 (Margin 274); 22 Am. & Eng. Enc. Law, 207 (note 1); Fost. Fed. Prac. 198; 31 W. Va. 472.

HOLT, PRESIDENT:

On writ of error to judgment of the Circuit Court of Hampshire county, rendered on the 6th day of December, 1895, upon a writ of *certiorari.* On the 18th day of June, 1895, the County Court of Grant County, upon the petition of John B. Ford and seven hundred and eighty nine other voters of that county, entered an order directing a special election to be held on the 27th day of August, 1895, at the several voting places, upon the question of the relocation of the county seat of Grant county from Petersburg, the present seat, to Maysville, the original county seat. This election was ordered to be held under

the provisions of section 15 of chapter 39 of the Code as amended and re-enacted by chapter 31 of the Acts of the Legislature (page 51) of the year 1895. The special election was held in pursuance of the statute and of the order of the county court, and the court met in special session, canvassed the returns, and ascertained and declared the result to be that eight hundred and seventy six votes were cast in favor of the relocation of the county seat at Maysville, and six hundred and four votes were cast against relocation; being a majority of two hundred and seventy two of all the votes cast, but lacking twelve votes of being three-fifths of all such votes. The amended section 15 required generally that there should be three-fifths of the votes cast for relocation in order to authorize such relocation. But in the body of the act introduced, as the new feature of the section 15 as amended and re-enacted, it prescribed: "That where the county seat of any county in this state has since the first day of January, 1872, been relocated by a special act of the legislature, in such case, if a majority of all the votes cast at said election upon the question be in favor of the relocation of the county seat at either of the places voted for, the said county court should enter an order declaring the place so receiving a majority of all the votes cast, therefor, to be the county seat of said county from and after that date." Thereupon in pursuance of the statute, the county court entered an order declaring that the county seat of Grant county was relocated at Maysville, in said county, and directed the records, books, papers, *etc.* pertaining thereto to be forthwith removed to said county seat of Maysville, and directing the courts to be thereafter held at a certain building known as the "Old Courthouse," at Maysville. John B. Groves and others, whose names were set forth therein, presented their petition to the judge of the circuit court, praying for a writ of *certiorari* to be awarded to such judgment and action of the county court. The judge in vacation awarded the writ, which was issued on the 5th day of September, 1895. On the 22nd day of October, 1895, the circuit court of Grant county entered an order removing the case to the circuit court of Hamp-

shire county.  And on the 4th day of December 1895, a final order was entered, reversing the order of the county court of Grant county on 2d September, 1895, reciting that: "As the number of votes cast at said election in favor of the relocation at Maysville was eight hundred and seventy six, and those against such change was six hunhundred and four, and that as the legal number of votes necessary to effect a relocation is three-fifths of all the votes cast, the result of such election, as so ascertained, is insufficient for the purpose of effecting such relocation, and such county seat is not relocated."  This decision was evidently based upon the view taken by the learned judge that the part of the act of 1895 mentioned, under which the election was held and the result declared, was unconstitutional.

On the 13th day of February, 1872, the legislature passed an act saying:  "That the county seat of the county of Grant should cease to be at Grant Court House twenty days after the passage of this act, and shall from and after the expiration of twenty days be located at Petersburg in said county."  Grant Court House and the town of Maysville designate the same place.  Since the 1st day of January, 1872, no other county seat in this state has been relocated by a special act of the legislature, for the Constitution completed on the 9th day of April, 1872, was ratified and adopted by the vote of the people on the fourth Thursday (22d day) of August, 1872, and from and including that day became operative and in full force.  Section 39 of article VI of the Constitution (with parts omitted having no bearing) reads as follows:  "The legislature shall not pass local or special laws in any of the following enumerated cases; that is to say:  For * * * locating or changing county seats; * * * releasing title to forfeited lands.  The legislature shall provide by general laws, for the foregoing and all other cases for which provision can be so made; and in no case shall a special act be passed, where a general law would be proper, and can be made applicable to the case."  The county seat of Grant county was relocated at Petersburg by special act of the legislature passed on the 13th day of February, 1872; that is to

say, since the 1st day of January, 1872. The Acts of 1872 show that the county seat of no other county was relocated during the period from the 1st day of January, 1872, to the 22d day of August, 1872, the day when the Constitution went into effect. The act of 1872, and all acts of the legislature from the 1st day of January, 1872, to the 4th day of February, 1895, were relied on in the court below as showing that no county seat save that of Grant county was relocated by special act of the legislature, and therefore this Court must take judicial notice thereof. See section 1 of chapter 130 of the Code. This act took effect for the first time on the 1st day of July, 1850. See Code 1849, tit. 51 p. 660, s. 1. See effect thereof as shown in *Somerville* v. *Wimbish,* 7 Gratt. 205, 226; *Hart* v. *Railroad Co.,* 6 W. Va. 336, 350; *State* v. *Railroad Co.,* 15 W. Va. 392; *Beasley* v. *Town of Beckley,* 28 W. Va. 81; *Ross* v. *Austill,* 2 Cal. 183. Therefore we judicially know when the act of 14th day of February, 1895, now in question, was passed, Grant county stood alone as the one county having this peculiarity in its history, and no other county could have it when the act of 1895 was enacted—not in the past, for the tract of time from 1st January, 1872, to the 22d day of August, 1872, was gone beyond the reach of change; not in the future, for the Constitution barred the way by prohibiting such special laws by name. So that no other county could get into this peculiar class of counties except by repealing or overruling section 39 of article VI of the state Constitution; and it would be a strange construction to hold a statute valid because the class of one must be treated as a class of two potentially, because it may be possible for county No. 2 in that way to break into this closed circle of classification.

In the nature of things, it is of course beyond legislative power to pass a general law within the meaning of the Constitution, which does not have as its subject-matter a class bound in writing by some class characteristic, and such class must include more than one individual, actual or potential. And no matter what disguise or circumlocution of apparent generality may be used, it is idle to talk about the creation of a class which expressly takes as the class characteristic, to designate the members of the class, the

idiosyncracy or peculiarity of the one county of Grant, as a mark of apparent classification, when in fact that mark distinctively distinguishes and sets apart in that regard the county of Grant from all other counties, both in the present and for the future; for as we have seen, the time is past; the circle is closed tight around the solitary county of Grant, after the 22d day of August, 1872, and still again after the 14th day of February, 1895; and no other county could, after either date, have got in without overriding the Constitution, not after the 14th day of February, 1895, for the act itself bars the door after that date, using the language, "where the county seat of any county has been relocated, *etc.*, since the 1st day of January, 1872."

Thus we see that this law has selected as its class characteristic the peculiarity of the solitary county of Grant, which no other county can ever match, for such second county could not get in after the 14th day of February, 1895, for by its own terms that was the limit fixed; and we judicially know that from the 1st day of January, 1872, to the 14th day of February, 1895, Grant county stood alone as the one county whose county seat had been during that period relocated by a special act of the legislature; so that in meaning, purpose, and effect it is a law not in the slightest degree more general, or in a less degree peculiarly and distinctively descriptive of Grant county, than if it had spoken directly out and said: "But in the case of Grant county a majority of the votes cast shall be sufficient to relocate the county seat." This is classification run mad. Why not say all counties of the state named "Grant"? See *Com.* v. *Patton*, 88 Pa. St. 258, 260. This statute, as to the majority clause, no matter what circumlocution or specious guise of classification was used, could have no reasonable application or effect except to point out the relocation at the county seat of the county of Grant as its only subject-matter; and this makes it special, as relating in its necessary effect to one county, and not to a class of counties; for without a class, actual or potential, as the subject-matter, there can be no general law. See *Henderson* v. *Mayor*, 92 U. S. 259, 268; *Minnesota* v. *Barber*, 136 U. S. 313, 319; 10 Sup. Ct. 862; *State* v. *Hammer*, 42 N. J. Law, 335; 23 Am.

75

& Eng. Enc. Law, 149, notes. There is no dividing line between a local and a general statute. It must be either the one or the other. If it applies to the whole state, it is general; if to a part only, it is local. *Davis* v. *Clark*, 106 Pa. St. 377, 384. This statute is local, because its necessary operation and effect confines it to the relocation of the county seat of one single county as opposed to all the counties of the state over which the legislative jurisdiction extends. "A law general in form, and purporting to apply to all counties of a designated class, * * * but which in fact can never operate but in one county in the state, is local and void," *etc.* *State* v. *Ellet*, 47 Ohio St. 90 (23 N. E. 931); *Id.*, 21 Am. St. Rep. 772 (see note 780 for a helpful discussion of what is a general law). It is not the form, but the effect, of a statute which determines its special character. *Edmonds* v. *Herbrandson*, 2 N. D. 270 (50 N. W. 970). If, therefore, this law is both local and special, with the appearance of generality resulting from the circumlocution used to disguise its true character, using as its class characteristic a mark that is peculiar to one particular county, which, by the language and effect of the act itself, can never belong to or designate any other county, it would be out of place to consider the question whether such designation attempted to be used as the basis of classification is of such a nature as to mark the objects so designated as peculiarly requiring exclusive legislation. See *State* v. *Hammer*, 42 N. J. Law, 435, 440. This constitutional provision is mandatory, and compliance with it is necessary to the validity of the law in question; and whether, in any given case, the legislature has transcended its power and passed a law in conflict with the constitutional limitation in respect to local and special laws, is essentially a question of law, and must necessarily be decided by the courts. See *Ayars' Appeal*, 122 Pa. 266 (16 Atl. 356); *Ex parte Falk*, 42 Ohio St. 638; *State* v. *Powers*, 38 Ohio St. 54; and note to *State* v. *Ellet* (Ohio Sup.) 21 Am. St. Rep. 780 (23 N. E. 931).

The tendency of recent state constitutions to restrict legislative power from passing local or special laws which are generally intended to promote private, rather than the pub-

lic interest in this and many other specified particulars, is manifest, and the reason for it so plain and obvious, that we need not stop to state it. Among the states having similar prohibitions in their constitutions against special legislation, where its effect has been considered and passed upon by the courts, are the following: The state of New Jersey, and in the case already cited of *State* v. *Hammer*, 42 N. J. Law, 440, which has become a leading case upon the subject. North Dakota, in the case of *Edmonds* v. *Herbrandson*, 2 N. D. 270, (50 N. W. 970) Minnesota, in the case of *Nichols* v. *Walter*, 37 Minn. 264; 33 N. W. 800. Missouri, in the case of *State* v. *Herrmann*, 75 Mo. 340. Pennsylvania, in the case of *Ayars' Appeal*, 122 Pa. St. 266 (16 Atl. 356) wherein it was held that the question whether a law is local or special within the prohibition of the constitution is essentially a question of law necessarily to be decided by the courts. On this point, see, also, *State* v. *Mayor, etc.* 40 N. J. Law, 71, 80. See case of *Com.* v. *Patton*, 88 Pa. St. 258; *Davis* v. *Clark*, 106 Pa. St. 377. Why not say in this case, "But in all counties of the state named Grant, if a majority of all the votes, *etc.*"? Ohio, in the case of *State* v. *Ellet*, 47 Ohio St. 90 (23 N. E. 931). A law general in form, but which in fact can never operate but in one county in the state, is local, and void, as being in conflict with the Constitution. Illinois, in the case of *Devine* v. *Commissioners*, 84 Ill. 590. A statute which by its terms can have application to but one county in the state although purporting to be a general law applicable to all counties having a certain population, is special legislation within the constitutional inhibition on that subject. Suth. St. Const. pp. 160, 167, § 127 *et seq.* Kansas, in the case of *City of Topeka* v. *Gillett*, 32 Kan. 431 (4 Pac. 800). Courts, for the purpose of construing a constitution or a statute, must take judicial notice of everything which may affect the validity or meaning of such constitution or statute; citing *Division of Howard Co.* 15 Kan. 194. And the statute here in question indirectly requires us to notice the special acts relocating county seats passed after the 1st day of January, 1872, and before the 22d day of August, 1872, and the 14th day of February, 1895, the date of its passage. Nevada, in the case of *State* v. *Boyd*, 19 Nev. 43 (5

Pac. 735). The act is illusory and unconstitutional if the basis of classification in its practical operation makes the law applicable only to two counties, and can never affect any other county. California, in the case of *People* v. *Central Pac. R. Co.* 83 Cal. 393 (23 Pac. 303). A clause or provision special in its character, applying to particular individuals, particular places, or particular cases, is none the less special because inserted in the most general of public acts. Indiana, in the case of *Mitchell* v. *McCorkle*, 69 Ind. 184. This curative statute, it will be seen, is expressly limited to judgments, decrees, and orders taken before the passage of the act; * * * nor does it legalize and validate all the judgments, orders, or decrees of all the circuit courts of the state which may have been taken on the first day of the term. And the curative act was therefore held to be unconstitutional, as both special and local.

Special laws are those made for individual cases, or for less than a class requiring laws appropriate to its peculiar condition and circumstances; local laws are laws special as to place. See Suth. St. Const. § 127, citing *State* v. *Wilcox*, 45 Mo 458, 465. A General law is that which relates to a whole class of persons, places, relations, or things grouped according to some specified class characteristic, binding all within the jurisdiction of the lawmaking power, limited as that power may be by its territorial operation or by constitutional restraint. And it is none the less general though at the date of its passage there may be but one, or in fact not one, individual of the class thus created, provided it be reasonable, and not illusory, in its generalization; and provided that the circle or ring of classification be such as to remain open to receive the potentials which may arise bearing the peculiar mark of the class. See note to *State* v. *Ellet* (Ohio Sup.) 21 Am. St. Rep. 780 (23 N. E. 931); *Van Riper* v. *Parsons*, 40 N. J. Law, 123; Suth. St. Const. § 127. "A general or public act is universal rule that regards the whole community. * * * Special or private acts are rather exceptions than rules, being those which operate upon particular persons and private concerns." 1 Bl. Comm. 86. Nothing could more fitly describe the law in question, for we find it as an exception in the body of the

general law on the subject prescribing a three-fifths vote, adopted obviously to give county seats some sort of stability by putting their removal and relocation beyond the reach of fluctuating majorities. And if we are to take the recitals contained in the act of February 13, 1872, as the occasion of its enactment to be true, then such act was merely declaratory of the will of the majority of the votes as expressed according to the law as it then was, made necessary because there was no practical method of causing a refractory board of supervisors to declare the result, though commanded to do so by a peremptory *mandamus*. Why this state of facts should be a good reason for giving the minority, now become the majority, another opportunity to relocate by a majority vote, is hard to see. There must have been, in that transaction, some actual or supposed grievance that we do not see which induced the legislature to make Grant county an exception to the general rule. And that it is a special exception in fact, if not in form, is shown by its surroundings, the individual nature of its subject-matter, making it necessarily special in effect. See *Hixson* v. *Burson* (1896, Ohio Sup.) 43 N. E. 1000. We have forty five state constitutions; all of them, or the majority of them, dealing in some degree with this subject. I take it for granted that counsel have searched this field for cases tending to throw upon the subject the weight of being directly in point or the light of some analogy; and, as they have failed, in my opinion, to produce one laying down, in *dictum* or otherwise, a different doctrine, I have a right to infer that such cases either can not be found, or are, at least, exceeding scarce.

It is said by counsel for appellee (representing the town of Maysville) that this constitutional provision spends its whole force in prohibiting the legislature from passing an act for locating or changing a county seat by legislative fiat. That a part of its force, or the force of a part of it, is thus spent is true. But let us see how section 39 of article VI of the Constitution (Code 1891, p. 31) reads as a whole, leaving out the most part of what is irrelevant: "The legislature shall not pass local or special laws in any of the following enumerated cases; that is to say, for granting divorces,

* * * locating or changing county seats, * * * releasing title to forfeited lands. The legislature shall provide by general laws for the foregoing and all other cases for which provision can be so made; and in no case shall a special act be passed where a general law would be proper and can be made applicable to the case." It is true, the act in question is not one directly by legislative fiat changing the county seat from Petersburg to Maysville. But one such was passed from the 1st January, 1872, to the 14th day of February, 1895, the date of the act in question (Acts 1895, p. 51) and that was the act passed 13th February, 1872, removing the county seat of Grant county from Grant Court House (Maysville) to Petersburg, in said county, (Acts 1872, p. 33). The legislature shall pass no local or special law locating or changing the county seat of Grant county, but shall provide by general law for such locating or changing of county seats. This the legislature had done by the Code. See section 15 of chapter 39 of Code (Ed. 1891, p. 280). Whenever the citizens of any county desire the relocation of their county seat, they may, *etc.* The legislative power to classify and still make the law general has already been conceded to the fullest extent; in fact, there can, in the nature of things, be no general law without classification, and no classification in fact without a class characteristic, which marks and designates at least two individuals, actual or potential. But it is beyond legislative power, with or without a constitution, to take a tract of past time reaching from the 1st day of January, 1872, to the 14th day of February, 1895, during which no county seat save the county seat of Grant county was relocated by a special act of the legislature, and by writing across its face "General Law," make a general law which reads as follows: "And where the county seat of any county in this state has since the 1st day of January, 1872 (that is, between the 1st day of January, 1872, and the 14th day of February, 1895, the date of the act) been located by a special act of the legislature, in such case, if a majority of all the votes cast at said election," *etc.* The legislature, by taking this period of past time during which the county seat of no county save that of Grant county was thus relo-

cated, as the earmark of the class thus attempted to be created, has, for our purpose of construction, taken as a basis of classification a test past and gone, a circle or ring of classification which was finally closed on the 22d day of August, 1872, by the adoption of the present Constitution; and such closure, shutting in the one instance of Grant county and shutting out all others, was made fixed and fast by the act itself on the 14th day of February, 1895. This so called "class" embraced one actual individual and excluded all potential members. It could have no future. It was not only not prospective; it was individual and retroactive purely, so far as the remedy was intended to apply, or could be applied. To take from the dead past a specified tract of time, and one single, indirectly specified transaction that occurred therein, and which can never be repeated or matched as to the peculiarity of having taken place during such specified tract of time, and take such peculiarity as to time of occurrance as an essential part of the mark or characteristic which is to distinguish the class set apart and dealt with by law, is, as a general law, almost as strange in the method of selecting its subject-matter as, by reason of being special in effect, it is unconstitutional in result. The provision is therefore without doubt a special, individual exception to the general law in which it is embodied. What effect it may have on the whole act we are not called on to say, but it at least shows that there may be some danger of invalidating the whole act by tinkering it in that way. For our present purpose it is enough to say that, if held valid, it will be an invitation to the whole brood of the excluded to be creeping through in the same way, by hiding themselves by some such circumlocution in the belly of some general law. And on looking over the list of enumerated cases excluded by name, it is easy to expect that we will soon have attempts to re-enact general laws for no other purpose than to let some of them in by the same successful mode of procedure.

The defendant in the writ of *certiorari* to the county court of Grant county contends that there was no legal service of the writ on it, and that there was no such general appearance as cured such defect in the return of the ser-

vice of the writ, and that there is no such appearance unless it be clearly shown by the record that the defendant appeared for some purpose; citing *Merkee* v. *City of Rochester*, 13 Hun, 157. The record must affirmatively show this intent to waive an appearance for some purpose. Appearance is the first act of the defendant in court (1 Tidd, Prac. 262; 6 Com. Dig. tit. "Pleader," B, 1, p. 6) and the appearance of the defendant is triable by the record, which is a verity (1 Co. Litt. 260; 1 Chit. Pl. 512). The order entered on the 15th day of October, 1895, reads as follows: "This day came the parties, by their attorneys, and, the writ of *certiorari* issued in this case having been duly served upon the defendants, this case is ordered to be docketed and continued until to-morrow." On 22d October, 1895, this order was entered: "On motion, and for good cause shown, it is ordered by the court that this cause be removed to the circuit court of the county of Hampshire." "On the 3d day of December, 1895, in the circuit court of Hampshire county, the attorneys present and practicing in this court proceeded by ballot to elect a judge to preside at the trial of said cause. * * * D. C. Westenhaver * * * was elected, and thereupon took the oaths prescribed by law, * * * and entered upon his duties aforesaid." Therefore the parties came by their attorneys. What parties? The plaintiff is already in court, and need not come, *etc.;* but the defendant must come, or in some way be brought into and under the jurisdiction of the court, as the first act of the parties in court is that the defendant appears to the process against him. 6 Com. Dig. p. 6. See Rob. Forms, pp. 13, 94, 96, 101, 107, 115 *et passim*. This form is very generally used by our clerks to show that both plaintiff and defendant appeared. *Moss* v. *Moss' Adm'r.* 4 Hen. & M. 293, 302. "The word 'parties' properly and exclusively appears to apply to those who were already in court," and the record showed affirmatively that two of defendants were served, three were returned "No inhabitants of the county," and of course the two defendants served were the ones who presumptively appeared. But an appearance as thus entered by the clerk is to be taken to be general, unless the contrary appears. In *Shepherd* v. *Brown*

20 W. Va. 13, 18 (3 S. E. 186, 189) it was held that by appearance to a motion against a sheriff and his sureties under section 5 of chapter 121 of the Code, and repeated continuance of the case, generally by consent of parties, the defendants waive any objection to the notice because not served in time. On page 18, Judge Green, delivering the opinion of the Court, says: "I have paid no attention to this point (motion to quash because notice was not served in time) because by appearance to an action in any case for any other purpose than to take advantage of the defective execution or the non-execution of notice or process, a defendant places himself precisely in the situation in which he would be if notice or process was executed upon him properly, and in proper time, as he thereby waives all objection to the defective execution or non-execution of process;" citing *Burlew* v. *Quarrier*, 16 W. Va. 108, and various other cases. See 2 Bart. Law Prac. p. 274, § 87. Appearance of the defendant is in and of itself a distinct and formal act of great importance, for it is the processor act by which a person against whom a suit has been commenced submits himself to the jurisdiction of the court. It may be in person or by attorney. And the formal entry thereof in the proper office or in court has no significance, generally, in relation to the plaintiff, who is presumed to be in court, unless he is named expressly or by implication; but such entry or general appearance does mean the defendant, for both parties are then considered as in court. See 2 Enc. Pl. & Prac. 590, notes. The rules as to entry of an appearance and as to pleadings are disconnected. Appearance has the meaning of being present in court, and at common law appearance and pleading were perfectly segregated, for there can be no pleading till appearance is effected. See 3 Bl. Comm. 270, 292; Steph. Pl. (Tyler's Ed.) 62, appendix, note 13; 2 Enc. Pl. & Prac. 594. Yet now, in practice, appearance is generally followed connectedly by some plea. By such voluntary appearance the defendant to the writ of *certiorari* as a distinct act submitted itself to the jurisdiction of the court, and two months thereafter it was too late to object to the return of a writ, the only purpose of such return being to bring the defendant under the jurisdiction of the court.

Taking this view of these two questions involved in the case, in my opinion the judgment of the circuit court is clearly right, having no doubt as to the unconstitutionality of that part of the act of 14th February, 1895, here complained of. As to the validity or invalidity of the act as a whole I express no opinion. Affirmed.