Nicholas J. Tweel

*v.*

West Virginia Racing Commission, *Etc., et al.*

(No. 10585)

Submitted May 19, 1953. Decided June 30, 1953.

LOVINS, JUDGE, concurring.

*Campbell, McNeer* and *Woods, Selden S. McNeer,* and *Robert K. Emerson,* for petitioner.

*John G. Fox,* Attorney General, *W. Bryan Spillers,* Assistant Attorney General, for defendants.

GIVEN, JUDGE:

In this original proceeding in mandamus Nicholas J. Tweel, petitioner, seeks the issuance of a writ commanding the defendant, West Virginia Racing Commission, "to issue a license to petitioner to conduct a horse race meeting at petitioner's race track", to be constructed partly in Cabell County and partly in Putnam County, West Virginia. An application for the license was made by petitioner and refused by the commission, for the reasons set forth in a letter to petitioner, dated April 13, 1953, in the following language:

"We acknowledge receipt of your letter of April 8, 1953, which constitutes an application for license to hold

or conduct a Horse race meeting at the track you are in the process of constructing near Hurricane in Cabell and Putnam Counties.

"We, the newly formed Commission, made up of J. F. Edwards, Chairman, Frank Brooke, Vice-Chairman, and Ralph LePore, Member, find your application to be in due form, and it meets with the unqualified approval of the Commission, but it is necessary for us to decline to issue the license for which you have applied because of the enactment by the West Virginia Legislature on March 7, 1953, of Senate Bill No. 127, which is effective ninety days from passage.

"While we recognize the fact that you were in process of constructing this track prior to the date of the passage of said act, and, in fact, prior to the beginning of the last Legislature, nevertheless, because the construction of this track cannot be completed prior to the effective date of this act, and also because you will not have held race meetings at the track prior to the effective date of the act, we believe you are subject to the act, and it will be necessary for you to make application for a construction permit in accordance with the terms of this legislation."

No issue of fact is involved. The answer of defendants admits the material facts alleged in the petition, but says that the Act of the Legislature mentioned in the letter quoted above is constitutional. Petitioner contends that the Act of the Legislature is violative of the due process provisions of the Federal and State Constitutions, as being discriminatory, and also violative of Section 39, Article VI, of the State Constitution, as being, in effect, a special Act, where a general Act would have been proper.

The Act in question, Chapter 112, was passed by the Legislature on March 7, 1953. It became effective ninety days after passage. It simply amended Chapter 19 of the Official Code by adding thereto Article 24. The Act

specifically provided that it was "supplementary and in addition to article twenty-three * * * and nothing herein contained shall relieve the person desiring to conduct a horse race meeting, where the pari-mutuel system of wagering is followed, at either an existing race track or one which shall be hereafter established, of the necessity of securing the license therefor and otherwise complying with all of the terms, provisions and conditions of article twenty-three of this chapter." Prior statutes dealing with regulation of the business of horse racing were not repealed or amended. Section 1 of the Act of 1953 requires that no person, after the effective date of the Act, should "construct a race track where horse race meetings are to be held and the pari-mutuel system of wagering conducted * * * unless and until such person shall first have applied for and obtained" from the racing commission a construction permit. After consideration of the application the commission is required to enter an order giving "tentative approval" or showing refusal of the license. In the event "tentative approval" is given, the commission is required to prepare and publish a notice of that fact and of the further fact that "a construction permit" will be issued to applicant at the expiration of sixty days from the date of the first publication of the notice, "unless within said time an application for a local option election shall have been filed with the county court of the county in which said race track is proposed to be established * * *."

Sections 2 and 3 provide the manner in which a county court shall hold such local option election. In Section 3 it is provided that after the votes cast shall have been canvassed by the county court and the results certified to the racing commission, "thereupon said commission shall issue or refuse to issue the construction permit in accordance with the results of such local option election."

Section 4 furnishes a form for the ballot to be used at the local option election. Section 5 inhibits the holding of any other such election within the county for a period

of five years following the holding of such an election, inhibits the racing commission from considering any other application for such a construction permit within that period, and further provides: "In the event a race track shall be constructed in a county pursuant to a construcon permit issued by the West Virginia racing commission in accordance with the provisions of this article, no local option election shall thereafter be held as to any race track constructed pursuant to such construction permit."

The part of Section 6 of the Act alleged to render it unconstitutional is quoted: "Nothing herein contained shall apply to any race track heretofore established in the state of West Virginia and at which races have been conducted by the owners or operators thereof under and in pursuance of licenses issued by the West Virginia racing commission in accordance with the provisions of article twenty-three of this chapter. The establishment of any new or additional race track within a county in West Virginia in which a race track has heretofore been established and operated under licenses issued by the West Virginia racing commission, whether by the persons owning and operating such existing race track or others, shall be subject to the provisions of this article * * *." Section 7, the only other section contained in the Act, defines certain terms used therein.

Prior to the passage of the Act of 1953, the law governing horse racing where pari-mutuel wagering is permitted was Chapter 71 of the Acts of the Legislature of 1935, now Code, 19-23, as amended. That Act contained no provision relating to any "construction permit" of any race track or facilities. It is provided in that Act, however, that before any "horse race meeting" where pari-mutuel betting is had, the person intending to hold the same shall first obtain a license therefor from the racing commission. The requirements and procedure to obtain such a license are set forth in Section 5 of the 1935 Act, reading:

"Any person desiring to conduct a horse race meeting within the state of West Virginia and to permit or conduct pari-mutuel pools shall apply to the West Virginia racing commission for a license to do so. Such application shall be filed with the commission at least thirty days prior to the first day of each horse race meeting which said person proposes to hold or conduct. The commission shall prescribe blank forms in making such applications. Such application shall specify the days upon which said race meeting is to be conducted. It shall state the name of the person making such application, the post office address of the person making such application, the number of days he intends to hold or conduct such meeting (which shall be successive week days, excluding Sundays,) and the location of the place or track or enclosure where he proposes to hold or conduct such race meeting, and shall supply such other data and information as the commission shall prescribe.

"Within ten days after the filing of such application with the commission, the commission shall grant or reject any application for a license for any cause deemed by it sufficient. If said license is refused, said commission shall publicly state its reasons for the refusal, and said reasons shall be written in full and attached to the application so refused, which refusal and reasons for same shall, at all times, be subject to inspection upon application of anyone desiring to inspect same. Said findings shall be subject to review by mandamus in any court of this state having jurisdiction, with the right to appeal to the supreme court of appeals in the manner prescribed by law."

Prior to January 8, 1952, petitioner had inquired of members of the racing commission whether a license would probably be issued for the holding of horse race meetings in the southern part of West Virginia, in the event of the construction of a modern horse race track and facilities and, on that date, the commission wrote petitioner as follows:

"The Bearer of this statement, Nicholas J. Tweel, and Associates of Huntington, West Virginia, have this day submitted to the West Virginia Racing Commission a proposal to build a night Harness Race Track on Route # 60 in the vicinity of Huntington or Charleston, West Virginia.

"The West Virginia Racing Commission will issue a license; provided, Mr. Tweel and Associates erect a modern plant with pari-mutuel betting equipped with a totalisator, to be approved by the Commission. If the Construction of the plant is modern and has the facilities for good racing, public accommodations for their patrons and, in other words, modern in every respect, the West Virginia Racing Commission will issue a license and authorize dates as requested and suggested for May, June, September and October.

"The West Virginia Racing Commission will assist in every way possible in helping to build this modern plant and lend their good will to the success of this venture.

"Respectfully,

"WEST VIRGINIA RACING COMMISSION

"/s/  Mont. M. McIntire, CHAIRMAN
"/s/  Gordon P. Fought, MEMBER
"/s/  Bethel Adkins, SECRETARY

"The West Virginia Racing Commission has further agreed to permit Mr. Tweel and Associates the choice of night thoroughbred racing if preferred to Harness or trotters with choice and length of dates as described."

It is not contended now that petitioner acquired any right or privilege by virtue of the letter of January 8, 1952, which would in any way interfere with the right or power of the Legislature to enact the particular statute involved, and we think no such right or privilege exists. However, subsequent to the receipt of the letter, and prior to the convening of the 1953 session of the Legislature, petitioner purchased one hundred and

twenty acres of land, partly in Cabell County and partly in Putnam County, with the intention of constructing and operating a horse race track thereon and, in addition to the cost of the land, expended approximately $37,500.00 in initial work in preparing for the construction of the track and facilities.

At the time of the passage of the 1953 Act, three horse race tracks existed in West Virginia, one each in the counties of Ohio, Hancock and Jefferson, all in the northern part of the State. Licenses had been theretofore issued for the holding of horse race meetings at each of such tracks, and such meetings had been held. The record does not indicate that any application for any such license, other than that of petitioner, had ever been made for the holding of such a meeting at any point in the southern part of the State.

It may help toward clarity to note here certain facts believed significant: Any license for the holding of a horse race meeting at which pari-mutuel betting is permitted, whether the meeting is to be held at a track existing before the passage of the 1953 Act, or constructed subsequent thereto, would issue by virtue of Section 5 of the 1935 Act, quoted above, and all licensees would acquire the same rights and privileges under such a license, subject to such restrictions as made by the racing commission pursuant to authority vested in it by that Act. No requirement existed as to any race track construction permit at the time of the licensing of the three existing race tracks, and continuance of the three existing race tracks is not made to depend upon the result of any local option election. The 1953 Act requires that a local option election be held as to any new race track in the counties where there existed, at the time of the passage of the Act, a race track, as well as in counties where no race track existed. Requirements of the 1953 Act relating to local option elections are made applicable to petitioner and to all applicants for licenses who apply subsequently to the effective date of that Act, while no

such requirements were ever applicable to licenses granted to the owners of existing race tracks.

There can be no question, and petitioner concedes, that the State, under its police power, may regulate or prohibit horse racing where pari-mutuel wagering is permitted. This is succinctly stated in the opinion in *State* v. *West Virginia Racing Commission*, 133 W. Va. 179, page 192, 55 S. E. 2d 263, in the following language: "There cannot, in our opinion, be any doubt as to the power of the Legislature to regulate horse racing, nor does there seem to be any contention on that point. Whatever may be said in favor of horse racing, and much can be said, it must be admitted that great evil attends its practice, such as calls for the intervention of the State, under its police power, to the end that such evil be minimized so far as it is possible to do so. This intervention and control is exercised under the police power of the State, and the use of that power rests with the Legislature. The police power is broad and sweeping, inherent in sovereignty and, except as restricted by constitutional authority, or natural right, which, in effect, is unlimited * * *." See 16 C. J. S., Constitutional Law, Sections 472, 473; *State Racing Commission* v. *Latonia Agriculture Assn.*, 136 Ky. 173, 123 S. W. 681; *People* v. *Monroe,* 349 Ill. 270, 182 N. E. 439; *State* v. *Thompson,* 160 Mo. 333, 60 S. W. 1077, 54 L. R. A. 950; *State* v. *Rose,* 40 Mont. 66, 105 P. 82.

It is just as certain, however, that such regulation would not be permitted in such manner as to unreasonably discriminate or substantially deny equal protection to those of the same class, in the exercise or control of such a business. All of the same class permitted to engage in such business must be treated substantially alike —that is, allowed substantially the same rights and privileges. *Colgate* v. *Harley,* 296 U. S. 404, 80 L. ed. 299, 56 S. Ct. 252. Like treatment of all persons similarly situated is all that is required by the equal protection clauses of the Federal and State Constitutions.

"The fact that a statute discriminates in favor of a certain class does not make it arbitrary if the discrimination is founded upon a reasonable distinction, or if any state of facts reasonably can be conceived to sustain it." Point 4, Headnotes, *State Board of Tax Commissioners* v. *Jackson*, 283 U. S. 527, 75 L. ed. 1248, 51 S. Ct. 540.

Any business which may be licensed is, of course, subjected, to some extent, to regulation. The extent of regulation permitted as to a business is often determined by the type or class of the particular business licensed. In *Ex Parte M. T. Dickey*, 76 W. Va. 576, 85 S. E. 781, L. R. A. 1915F, 840, we find this language: "As regards legislative power or control, the business or interest regulated by the ordinance is clearly distinguishable from vocations the pursuit of which does not involve the use of public property. The right of a citizen to pursue any of the ordinary vocations, on his own property and with his own means, can neither be denied nor unduly abridged by the legislature; for the preservation of such right is the principal purpose of the constitution itself. In such cases, the limit of legislative power is regulation, and that power must be cautiously and sparingly exercised, unless the business is of such character as places it within the category of social and economic evils, such as gaming, the liquor traffic and numerous others. To this list may be added such useful occupations as may, under certain circumstances, become public or private nuisances, because offensive or dangerous to health. All of these fall within the broad power of prohibition or suppression, some wholly and absolutely and others conditionally. Such pursuits as agriculture, merchandising, manufacturing and industrial trades cannot be dealt with at will by the legislature. As to them, the power of regulation is comparatively slight, when they are conducted and carried on upon private property and with private means * * *."

As often pointed out, it is not possible to formulate any rule or measure by which equal protection provisions

of the constitutional requirements may be definitely defined. Neither is it possible to lay down any rule that would determine, in each particular case, whether a legislative classification may be justified. What may be a proper classification as to one type of business may not be proper as to another type. Such a classification, however, must be founded upon real and pertinent differences, not upon irrelevant or artificial ones. See *Colgate* v. *Harley, supra; Barrett* v. *Indiana,* 229 U. S. 26, 57 L. ed. 1050, 33 S. Ct. 692; *Hing* v. *Crowley,* 113 U. S. 703, 28 L. Ed 1145, 5 S. Ct. 730. In *State Board of Tax Commissioners* v. *Jackson, supra,* it was held: "5. A very wide discretion must be conceded to the legislature in the classification of trades, callings, businesses, or occupations which may be subjected to special forms of regulation or taxation through an excise or license tax." See *City of New Orleans* v. *Smythe,* 116 La. 685, 41 So. 33, 6 L. R. A., N. S., 722, 114 Am. St. Rep. 566; *State* v. *Goodwill,* 33 W. Va. 179, 10 S. E. 285, 6 L. R. A. 621, 25 Am. St. Rep. 863.

From the birth of this State, wagering or betting in almost every form has been regarded as of evil tendency and made illegal. See Article 10, Chapter 61, Official Code. By special statute, pari-mutuel wagering is excepted from the application of general gaming laws. Code, 19-23-21, as amended. Thus, the declared legislative policy of the State has been to prohibit or regulate wagering. It is not for the courts, of course, to determine whether that policy is justified. Legislation relating thereto is to be merely interpreted and applied by the courts, but in accordance with constitutional provisions. That the Legislature has the power, under the Constitution, to declare such policy, or to prohibit or regulate such alleged evils, has already been determined by this Court in *Ex Parte Dickey, supra.* See *Commonwealth* v. *Kentucky Jockey Club,* 238 Ky. 739, 38 S. W. 2d 987.

Petitioner contends that the attempt of the Legislature, in the 1953 Act, to require petitioner to submit to a local

option election, discriminates against him, since the licensees of existing race tracks were not so required, and that any classification as to those licensed at the time of the effective date of the Act, and those not licensed, is arbitrary, without any reasonable basis, and not founded upon any material or logical purpose in connection with the enforcement of the Act. We do not agree. The authorities are generally to the effect that the exception from the effect of a licensing statute of existing businesses of the type which may be prohibited or regulated does not necessarily render the statute discriminatory or unconstitutional. The rule is clearly recognized in *Mayflower Farms* v. *Ten Eyck*, 297 U. S. 266, 80 L. ed. 675, 56 S. Ct. 457, relied upon heavily by petitioner, in this language: "We are referred to a host of decisions to the effect that a regulatory law may be prospective in operation and may except from its sweep those presently engaged in the calling or activity to which it is directed. Examples are statutes licensing physicians and dentists, which apply only to those entering the profession subsequent to the passage of the act and exempt those then in practice, or zoning laws which exempt existing buildings, or laws forbidding slaughter houses within certain areas, but excepting existing establishments. The challenged provision is unlike such laws, since, on its face, it is not a regulation of a business or an activity in the interest of, or for the protection of, the public, but an attempt to give an economic advantage to those engaged in a given business at an arbitrary date as against all those who enter the industry after that date * * *." See *People* v. *Monroe*, 349 Ill. 270, 182 N. E. 439; *Zodrow* v. *State*, 154 Wis. 551, 143 N. W. 693; *Ex Parte King*, 157 Cal. 161, 106 P. 578; *City of New Orleans* v. *Smythe*, 116 La. 685, 41 So. 33, 6 L. R. A., N. S., 722, 114 Am. St. Rep. 566; *City of Miami* v. *Green*, 131 Fla. 864, 180 So. 45; *Commonwealth* v. *Petri*, 122 Ky. 20, 90 S. W. 987; *Marquis* v. *City of Waterloo*, 210 Iowa 439, 228 N. W. 870; *Sampere* v. *City of New Orleans*, 166 La. 776, 117 So. 827, affirmed 279 U. S. 812, 73 L. ed. 971, 49 S. Ct.

262; Annotation, *State of Wisconsin ex rel. F. W. Woolworth Co.* v. *State Board of Health,* 237 Wis. 638, 298 N. W. 183, 136 A. L. R. 205. Cases may be found otherwise, but usually are based upon questions arising in connection with the type of businesses which may be regulated, to some extent, but can not be prohibited. Compare: *State* v. *Board of Health,* 237 Wis. 638, 298 N. W. 183, (Restaurant) ; *State* v. *Mayor and Common Council,* 226 Wis. 215, 276 N. W. 311, (Restaurant) ; *Town of Crowley* v. *West,* 52 La. Ann. 526, 27 So. 53, 47 L. R. A. 652, (Livery Stable) ; *Los Angeles County* v. *Hollywood Cemetery Association,* 115 Cal. 372, 47 P. 55, (Burial Lots) ; *State* v. *Kievman,* 116 Conn. 458, 165 A. 601, (Junk Dealer) ; *Town of Clinton* v. *Standard Oil Co.,* 193 N. C. 432, 137 S. E. 183, 55 A. L. R. 252, (Filling Station) ; *Pacific States Box & Basket Co.* v. *White,* 296 U. S. 176, 80 L. ed. 138, 56 S. Ct. 159, 101 A. L. R. 853, (Strawberry Containers).

To hold that a mere change in the requirements or in the procedure for the obtaining of such a license is discriminatory, would, in effect, be holding that when one Legislature, the first to act, has prescribed the requirements and procedure for the obtaining of such a license, that any subsequent Legislature would be without power to make any substantial change relating thereto. In other words, any substantial change would constitute such discrimination as to render any later enactment void. We think the applicable constitutional provisions do not have that effect. New or different requirements may become known or necessary for the proper and effective regulation of any business, and the right or power to utilize or adopt such requirements should be available to the Legislature without the necessity of destroying all existing rights of licensees by the revocation, or otherwise, of existing licenses. While the rights of such licensees are not regarded by law as being such that the licenses may not be revoked, though revocation results in property loss to the licensees, it is the prerogative of a Legislature to

weigh such individual rights against the advisability or necessity of the regulation or prohibition of the business in a particular manner. In the instant case all operators of horse race tracks, licensed either before or after the 1953 Act was passed, may acquire precisely the same rights and privileges in the operation of that business, and all persons applying for construction permits under that Act have precisely the same rights and privileges.

Petitioner relies upon cases like *Mayflower Farms* v. *Ten Eyck,* *supra*. That case involved the regulation of the sale of fluid milk. The statute authorized a board to fix minimum prices of fluid milk in cities of more than one million inhabitants, but fixed a differential of one cent per quart in favor of dealers "not having a well advertised trade name." The Act was held unconstitutional as denying equal protection of the law, for the reason that it was not shown that the differential had "any relation to public health or welfare or to operate to discourage monopoly or to be aimed at any abuse cognizable by law in the local business." We think the case not particularly applicable or controlling. In the instant case we can not say that the method of determining who may be licensed to operate horse race tracks has no "relation" to the regulation of that business. Rather, we think, the proper method of licensing such a business may be of major importance in such regulation. Certainly, the Legislature should not be prevented in succeeding in its efforts to provide a better system of licensing, or to improve an existing system.

For another reason, the existence of any discrimination is made doubtful and, where doubt exists, a statute will not be declared unconstitutional. Under Article 23, the older statute, very wide discretion was vested in the racing commission as to whether a license would issue to any applicant. No applicant was definitely entitled to any such license. Undoubtedly, the commission had the right and duty to consider the probability of the success or failure of any applicant in the operation of the

business, which in turn would depend very largely upon public opinion and attitude toward such a business in the particular vicinity. In effect, the 1953 Act does no more than remove the discretion from the racing commission and vest it in the voters of the political subdivision wherein the business is to be operated. Since the citizens of the vicinity where such a business is operated are the ones who will supposedly suffer most from the alleged evils thereof, we can not see that the Legislature did not act wisely in vesting the discretion in the voters instead of leaving the matter within the discretion of the racing commission; but, wisely or not, it was within the power of the Legislature to do so. See *Haigh* v. *Bell,* 41 W. Va. 19, 23 S. E. 666, 31 L. R. A. 131. Petitioner, of course, has been denied no license under the 1953 Act, since no local option election has been held in the county or counties wherein he proposes to construct a race track.

Petitioner's other contention is that the Act of 1953 is a special Act, within the meaning of Section 39 of Article VI of our State Constitution; that a general Act would have been proper, and that, therefore, the special Act is unconstitutional and void. The pertinent part of that section reads: " * * * in no case shall a special act be passed, where a general law would be proper, and can be made applicable to the case * * *." This contention is based on the theory that, since it does not apply to existing race tracks, the Act "creates a virtual monopoly of the business of conducting such race meetings in favor of the three race tracks now existing. It is perfectly obvious from this Act that it was enacted solely to delay and curtail effectively all competition with the three tracks now in existence." We think, however, this argument overlooks the fact that the Act applies to all race tracks thereafter licensed, whether in the three counties where race tracks existed or in other counties. Moreover, we can not assume that under the 1953 Act any local option election will be called, or that the voters of each of the several counties where such an election is called will reject any application for a license, so as to

leave a monopoly of the particular business with the three counties. As previously noted, the Act requires the racing commission to issue a construction permit in the event no local option election is demanded, by petition of at least fifteen per cent of the voters in the particular political subdivision, within sixty days after the date of the first publication of a notice. Certainly, under the 1953 Act, other licenses may be issued. There is, we think, no tendency toward any monopoly. The fact is that an additional race track in each of the fifty-five counties of the State is possible, depending upon results of local option elections. By the illustration, however, we do not intend to indicate—it is not necessary to decide here, that the State can not limit the number of race tracks where pari-mutuel wagering may be conducted.

In 4 M. J., Constitutional Law, Section 39, we find these statements:

"Special laws are those made for individual cases, or for less than a class requiring laws appropriate to its peculiar condition and circumstances; local laws are laws special as to place. A law is 'special' in a constitutional sense when by force of an inherent limitation it arbitrarily separates some persons, places or things from those upon which, but for such separation, it would operate. An arbitrary separation of persons, places or things of the same general class, so that some of them will and others of them will not be affected by the law, is of the essence of special legislation. What constitutes an arbitrary separation depends upon the purpose and subject of the particular act and the circumstances and conditions surrounding its passage.

"A law which bears on its face no evidence of an exclusive or discriminative purpose is prima facie valid. The test of a special law is the appropriateness of its provisions to the objects that it excludes. It is not, therefore, what a law includes that makes it special, but what it excludes. If nothing be excluded that should be con-

tained, the law is general * * *." See 33 Am. Jur., Licenses, Section 31.

Petitioner would support his contention as to the Act of 1953 being a special Act with cases like *State ex rel. Dieringer* v. *Bachman*, 131 W. Va. 562, 48 S. E. 2d 420; *Truax-Traer Coal Co.* v. *State Compensation Commissioner*, 123 W. Va. 621, 17 S. E. 2d 330; *Brozka* v. *County Court*, 111 W. Va. 191, 160 S. E. 914; and *Groves* v. *County Court*, 42 W. Va. 587, 26 S. E. 460. In the *Bachman* case, the Act declared to be a special Act attempted to legislate as to civil service for members of the fire department of one city only, Wheeling. Clearly, a general law, could have been made applicable. In fact, a general law, applying to all such fire departments, did exist. In the *Truax-Traer Coal Co.* case an Act of the Legislature attempted to permit the reopening of a claim before the State Workmen's Compensation Commissioner, after an order of the commissioner had become final. The Act applied to one claim only, clearly a special Act. A general law could have been enacted which would have applied to all like claims. The *Brozka* case held unconstitutional an attempt to relieve the taxpayers of a particular municipality of the payment of any road taxes. .Again, the Act questioned was clearly a special Act, because it was made to apply to the taxpayers of only one municipality. A general Act could have dealt alike with all municipalities of a particular class.

In the *Groves* case, the Act held unconstitutional as being a special Act provided that to authorize the relocation of a county seat, three-fifths of all votes cast at the election held for that purpose should be necessary. But the Act contained a provision to the effect "That where the county seat of any county in this state has since the first day of January, 1872, been relocated by a special act of the legislature, in such case, if a majority of all the votes cast at said election upon the question be in favor of the relocation of the county seat at either of the places voted for, the said county court should enter

an order declaring the place so receiving a majority of all the votes cast, therefor, to be the county seat of said county from and after that date." The county seat of Grant County was the only county seat relocated by an Act of the Legislature between 1872 and the date of the Act involved. The Court held: "5. To take from the past a specified period of time, and a single transaction as having occurred within that period, but by circumlocution described as a class, and then take as the characteristic of the class the peculiarity of having occurred within such past period of time, to mark and distribute the class thus apparently created and set apart as the subject-matter to be dealt with, such law, though general in appearance, is special in effect." Petitioner argues that, since the statute in the instant case does not require a local option election in the three counties where race tracks existed at the time of the passage of the 1953 Act, the Act arbitrarily created a class as to those three counties and is, in effect, a special Act. As before noted, however, the 1953 Act applies alike to all counties of the State, those wherein race tracks existed, as well as those where no tracks existed. It is true, of course, that the Act excepted from its operation the three existing race tracks but, as before noted, the Legislature was not bound to destroy the existing rights of those licensed before providing for more effective or desirable procedure for the issuance of other licenses. The existence of the three tracks, permitted to continue operation under the new Act, would just as certainly have continued under the old Act, even though petitioner had been licensed under the old Act. Therefore, we necessarily hold that the 1953 Act is not. invalid as being in violation of Section 39 of Article VI of the State Constitution.

Another principle applicable in the determination of questions of constitutionality of legislative enactments, consistently followed by this Court, and as well by the United States Supreme Court, is: "Every presumption is to be made in favor of the constitutionality of a stat-

ute, and it can never be declared unconstitutional except when it is clearly and plainly so. A reasonable doubt as to its unconstitutionality must be resolved in favor of the validity of the law." 17 M. J., Statutes, Section 29. See scores of cases cited to text. In *Booten* v. *Pinson*, 77 W. Va. 412, 89 S. E. 985, L. R. A. 1917A, 1244, it was held: "6. Unless the question is free from doubt, it is the duty of courts to uphold legislative acts as constitutional."

From the conclusions reached, it necessarily follows that the writ prayed for must be denied.

*Writ denied.*

LOVINS, JUDGE, concurring:

I concur in the result reached in this proceeding, and consider that the reasoning in the opinion fully justifies that conclusion. I think, however, that points 6 and 7 of the syllabus are inaccurate in the particulars hereinafter mentioned.

The accuracy of a syllabus prefixed to an opinion of this Court should be free from doubt. Reference to cases and statutes should observe that rule of accuracy so that authorities cited in the syllabus may be located without an extended and laborious search.

The Constitution of this state provides as follows: "When a judgment or decree is reversed or affirmed by the supreme court of appeals every point fairly arising upon the record of the case shall be considered and decided; and the reasons therefor shall be concisely stated in writing and preserved with the record of the case; and it shall be the duty of the court to prepare a syllabus of the points adjudicated in each case concurred in by three of the judges thereof, which shall be prefixed to the published report of the case." Section 5, Article VIII, Constitution of West Virginia. The language of the foregoing constitutional provision indicates to me that it places the responsibility for the syllabus prefixed to a published report of a case on this Court.

It is to be noted that the constitutional provision is directory, but should be followed. *Henry et al.* v. *Davis*, 13 W. Va. 230, 252; *Hall & Smith* v. *Bank of Virginia*, 15 W. Va. 323, 335; *Horner* v. *Amick*, 64 W. Va. 172, 175, 61 S. E. 40. In *Horner* v. *Amick, supra,* this Court, speaking by Judge Brannon, held: "Several times this Court has declared that that provision of the Constitution is only directory * * *. It should be fairly applied and all points involving novel questions of law not already settled should be passed on; but I have never been able to see that it demands of this Court discussion again and again and redecision of law well settled about which there can be no dispute, where the rule of *stare decisis* applies." See *Henshaw* v. *Insurance Co.*, 112 W. Va. 556, 565, 166 S. E. 15. In some cases this Court has held that a syllabus is not necessary. See *Long* v. *Potts*, 70 W. Va. 719, 75 S. E. 62, where the Court was divided in its opinion; *Feamster* v. *Feamster*, 51 W. Va. 506, 41 S. E. 910, where only a question of fact depending on evidence was presented. For a similar holding, see the case of *Koonce* v. *Doolittle*, 48 W. Va. 592, 37 S. E. 644.

My objection to the syllabus prefixed to the opinion in the instant proceeding relates to points 6 and 7.

I think the phrases appearing in the 6th and 7th points of the syllabus of the instant proceeding, "Now Code, 19-24", are inaccurate. Chapters 47 and 48 of the Acts of the Legislature, 1933, First Extraordinary Session, authorizes horse racing and pari-mutuel betting, and do not, in any. sense, purport to amend the Code of 1931, which is the only official code now existing in this jurisdiction. The same is likewise true of Chapter 71, Acts of the Legislature, 1935, Regular Session, amending and reenacting Chapters 47 and 48 *id*. It seems that Chapter 71 has been placed in Michies Code of 1949, a private publication, as Article 23, Chapter 19. But I fail to find any legislative authority for so designating it. The same situation prevails with respect to Chapter 158, Acts of the Legislature, Regular Session, 1947.

It is true that Chapter 112, Acts of the Legislature, Regular Session, 1953, provides that Chapter 19 of the Code of West Virginia, one thousand nine hundred thirty-one, *as amended,* [emphasis supplied] be amended by adding a new article to be designated as Article 24. This enactment of the legislature overlooks the fact that prior to the enactment of the 1953 statute, the Code of 1931 had not been amended by a formal provision of a legislative act. To refer to it as now, Code, 19-24, overlooks the *hiatus* which makes for inaccuracy and incorrect reference.

Hence, this criticism, based on what I regard as two inaccuracies in the syllabus. Such inaccuracies detract from an otherwise able opinion.